James MILLER, Petitioner-Appellant,

v.

Gary L. HENMAN, Warden, United States Penitentiary, Marion, Illinois, Respondent-Appellee.

No. 86–1035.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1986.

Decided Oct. 31, 1986.

Howard B. Eisenberg, Carbondale, Ill., for petitioner-appellant.

Laura J. Jones, Asst. U.S. Atty., Benton, Ill., Frederick J. Hess, U.S. Atty., East St. Louis, Ill., for respondent-appellee.

Before EASTERBROOK and RIPPLE, Circuit Judges, and GRANT, Senior District Judge.*

* The Honorable Robert A. Grant, of the Northern District of Indiana, sitting by designation.

EASTERBROOK, Circuit Judge.

The United States Penitentiary at Marion, Illinois, houses the worst of the bad. It is the maximum security institution in the country. Since October 1983 Marion has been "locked down". Every prisoner is confined to his cell most of the day; when let out for short periods, prisoners are apt to be chained and closely guarded. We have held that the lockdown does not violate the Constitution, including the due process clause of the fifth amendment. *Caldwell v. Miller*, 790 F.2d 589, 601–05 (7th Cir.1986). *Caldwell* did not deal with a due process claim based on particular regulations. 790 F.2d at 602. James Miller, who was transferred to Marion two months before the lockdown began, raises that claim in this action under 28 U.S.C. § 2241.

Miller is a federal prisoner serving a long term. "Persons convicted of offenses against the United States ... punishable by imprisonment for more than one year may be confined in any United States penitentiary." 18 U.S.C. § 4083. Until August 1983 Miller was held at Leavenworth, a "Level 5" prison designed for incorrigible inmates. After a weapon was found in his cell he was transferred to Marion, the only Level 6 prison, the end of the line for those who can not or will not accept the responsibility that comes with the limited freedom allowed in less secure prisons. In May 1984 he was put into segregated confinement at Marion as a result of the staff's complaints about his behavior. Segregation has strict controls and few privileges (no television, for example), although it is not as strict as Marion's Control Unit.

The transfer was authorized by 18 U.S.C. § 4082(b), which allows the Attorney General to designate the place of confinement for each federal prisoner; the Attorney General "may at any time transfer a person from one place of confinement to another." Miller concedes that § 4082(b) allows the Attorney General to move a prisoner for any reason or no reason (other than one, such as race, that a substantive portion of the Constitution forbids). See

*Brown-Bey v. United States,* 720 F.2d 467, 470 (7th Cir.1983). The prisoner has no statutory entitlement to be held in one prison rather than another; §§ 4082(b) and 4083 jointly negate any such claim.

When the jailer is free to move a prisoner for any or no reason, the due process clause does not require hearings. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). Miller tries to tiptoe around these holdings. His first argument is that Marion, as the nation's maximum security prison, and especially as a locked-down maximum security prison, is qualitatively different from all others. Miller assimilates Marion to an asylum, and *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), holds that there must be a hearing before a prisoner may be sent to a mental hospital. An inmate's life is so greatly changed on arrival at Marion, the argument runs, that the due process clause requires a hearing. *Caldwell* rejects this argument, 790 F.2d at 603–05, holding that even when locked down Marion is not "qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Vitek,* 445 U.S. at 493, 100 S.Ct. at 1263. Because the nature rather than the weight of the interest determines whether the due process clause applies, the Constitution does not require hearings before transfers to Marion.

Miller's second argument is that prisoners have a legitimate claim of entitlement to avoid Marion unless they have been classified as suitable. Every federal prisoner has a security classification and is supposed to be held at a prison as secure as (or more secure than) his classification. A prisoner classified Level 4 might be held in a Level 4 prison or in a Level 5 prison; a prisoner classified Level 6 must be held at Marion. More, Miller contends, since the lockdown began in October 1983, *only* Level 6 prisoners may be held at Marion. Inmates classified as suitable for less-secure prisons were removed from Marion after October 1983, Miller alleges, while he was retained. He seeks to establish that the security classification of a prisoner is governed by rules, for if rules establish a legitimate claim of entitlement to one classification rather than another, the due process clause requires hearings to determine whether the facts support particular treatment under the rules. *Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Huggins v. Isenbarger,* 798 F.2d 203, 205 (7th Cir.1986).

The Bureau of Prisons has general operating procedures, set forth in several loose-leaf documents, that instruct its staff how to make security classifications and when to transfer prisoners. These documents include "program statements" that describe the nature of particular prisons and the criteria that may make one prison rather than another preferable for a particular prisoner. The staff is told, for example, not to send to Marion anyone who needs psychiatric care; none is available. The documents also point out, just in case it were not obvious, that only the toughest, hardest to control prisoners should be sent to Marion. It is for roughnecks, not tax protesters. The point of Miller's argument is that written documents confirm what is undeniable: assignment to Marion is not random; people are not confined there for any reason or no reason; the Bureau of Prisons has a very good idea who should be at Marion. These criteria, Miller insists, establish a liberty or property interest, which in turn requires a hearing.

Just how much the writings structure the discretion of the Bureau's staff is open to question, because Miller has not seen all of them. Sections were made available, but critical portions were obliterated. The magistrate, who rendered final judgment by consent under 28 U.S.C. § 636(c), examined the deleted portions *in camera* and concluded that "the deleted material represents sensitive information, the release of which could endanger lives and cause security problems at USP–Marion." We have not examined the redacted portions of

the materials. The documents that have been disclosed show that the Bureau of Prisons has numerous criteria, such as the lack of need for psychiatric treatment. We assume, moreover, that there are undisclosed criteria, perhaps things such as "do not transfer to Marion any prisoner who has not committed two violent infractions in other prisons".

The appropriate question is not whether a writing takes the form: "If facts A and B, then result Z." It is instead whether the writing, whatever the form, creates a substantive rule of decision, a "legitimate claim of entitlement", *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), an "expectancy ... that was legally enforceable", *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 788 n. 21, 100 S.Ct. 2467, 2477 n. 21, 65 L.Ed.2d 506 (1980). The existence of substantive criteria is compatible with unfettered discretion to disregard the criteria. When the Court says that a person may act for any reason or no reason at all, and that this sort of freedom negates a liberty or property interest, it does not mean that the person exercising the discretion *acts* for no reason. The prisoners in *Meachum* and *Montanye* were transferred for disciplinary reasons, because appropriate officials thought they should be in more secure custody. Similarly, the Connecticut Board of Pardons did not draw straws to determine who would be pardoned. It tried to make sensible decisions. The question under the due process clause was not whether the Board had some standards (written or not) but whether these standards created substantive restrictions. *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981). There is a difference between criteria and binding rules of decision, a difference dispositive in this case.

■ The Attorney General possesses statutory discretion to move Miller where he will, but because the Attorney General does not act on his own behalf he must tell his subordinates what to do. Thus the instructions to the staff. The Attorney General could establish rules for the benefit of prisoners, giving them entitlements depending on provable facts. In order to restrict his statutory discretion, to bind himself by *enforceable* rules, he had to follow the forms of the Administrative Procedure Act. He could have adopted a rule after notice and comment, and administrative agencies must follow their own formal rules. *Accardi v. Shaughnessy*, 347 U.S. 260, 265–67, 74 S.Ct. 499, 502–03, 98 L.Ed. 681 (1954). The rule creates the substantive entitlement, just as a contract may, even if the statute does not. The enforceability of the substantive criteria in turn would create a liberty or property interest. When a regulation or rule with binding force establishes substantive criteria, it also creates constitutional "liberty" or "property". See *Wolff v. McDonnell*, 418 U.S. 539, 571–72 & n. 19, 94 S.Ct. 2963, 2982 & n. 19, 41 L.Ed.2d 935; *Hewitt*, 459 U.S. at 466–67, 103 S.Ct. at 868–69; *Olim*, 461 U.S. at 244–46, 103 S.Ct. at 1745. (We need not and do not discuss how much restraint on discretion is necessary to create such an interest, on which see, e.g., *Huggins v. Isenbarger; Scott v. Village of Kewaskum*, 786 F.2d 338 (7th Cir.1986); and *Reed v. Village of Shorewood*, 704 F.2d 943, 948–49 (7th Cir.1983).) But if all the Attorney General has done is to tell his staff how he wants to exercise his discretion—language that brings his subordinates' acts in line with his wishes but does not reduce his discretion to do otherwise—then there is no substantive rule enforceable in any forum. Whether we call the pronouncements "internal personnel manuals" or "precatory" or something else, they remain statements of the way in which discretion is exercised but do not establish substantive rights. See *Schweiker v. Hansen*, 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (an internal manual that is "not a regulation ... has no legal force, and it does not bind" the agency). And because the liberty and property of a prisoner are defined by the substantive rules of positive law, the absence of such rules is dispositive.

Quite a number of cases hold that regulations or policy manuals endow prisoners with liberty or property interests. Many of these cases, including some in our circuit, treat formal regulations, internal policies, and customary practices interchangeably. E.g., *Durso v. Rowe*, 579 F.2d 1365, 1371 (7th Cir.1978), *cert. denied*, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979); *Arsberry v. Sielaff*, 586 F.2d 37, 47 (7th Cir.1978). But with a few exceptions these cases predate *Hewitt*, which emphasized the importance of binding regulations. We concluded after *Hewitt* that only statutes and binding regulations establish liberty interests in favor of prisoners. *Mathews v. Fairman*, 779 F.2d 409, 414 (7th Cir.1985). And with only two exceptions the cases in other circuits do not explicitly consider whether the legal enforceability of the regulation or policy statement matters. The exceptions are *Lucas v. Hodges*, 730 F.2d 1493, 1501–05 (D.C.Cir.1984), and *Parker v. Corrothers*, 750 F.2d 653 (8th Cir.1984).

In *Lucas* a divided panel held that any policy manual or course of practice may establish liberty interests, even if the policy or practice creates no rights enforceable under the substantive law of the jurisdiction. *Lucas* later was vacated as moot, 738 F.2d 1392 (D.C.Cir.1984), so it is not binding even within the D.C. Circuit. We have given respectful attention to its reasoning yet find Judge Starr's dissenting opinion the more persuasive. The majority concluded that statements of policy, even established practices, can set up expectations of similar treatment in the future, and that these expectations are protected as liberty interests. This decision, it seems to us, contradicts *Connecticut Board of Pardons v. Dumschat*. The prisoner in *Dumschat* relied on a practice. Most prisoners were granted clemency, and the plaintiff said that this practice created an expectation of similar treatment. The Supreme Court concluded, however, that expectations based on practices are insufficient. There must be a *promise* of such treatment. 452 U.S. at 465–67, 101 S.Ct. at 2464–65. The Court stated: "The ground for a constitutional claim, if any, must be found in stat-

utes or other rules defining the *obligations* of the authority charged with exercising clemency." *Id.* at 465, 101 S.Ct. at 2464 (emphasis added). See also *Jago v. Van Curen*, 454 U.S. 14, 18–20, 102 S.Ct. 31, 34–35, 70 L.Ed.2d 13 (1981). Whether a writing establishes an "obligation" depends on whether it is enforceable under the law of the jurisdiction that adopted it. As a promise without consideration usually does not create a contract, so a policy manual usually does not create a rule binding on the proprietor of the manual—something *Hansen* shows. Judge Starr's conclusion that only "statutes and their implementing regulations", 730 F.2d at 1508, create liberty interests in favor of prisoners is logical. When the policy manual can vanish with a wave of the administrator's wand, or when the administrator is free to disregard his own words, the prisoner has nothing of substance and therefore neither liberty nor property.

*Parker* relies on the majority's opinion in *Lucas* without noting that it had been vacated. See 750 F.2d at 658–59. It also relied on the Second Circuit's opinion in *Dumschat*, noting that it had been reversed "on other grounds", which seems to us a mistaken interpretation of the Supreme Court's holding. See 750 F.2d at 659 n. 8. The court's rationale in *Parker* is fundamentally the same as *Lucas*, with the twist that the discussion is either dictum or an alternative holding (depending on one's point of view). Arkansas prison officials had promulgated a document they called a "regulation" and had stated that its rules were binding until altered. In federal court, however, the state's officials denied the authority of this "regulation" on the ground that it had been improperly promulgated. The Eighth Circuit observed that the record did not support the proposition; perhaps the regulation had been properly adopted, either because it complied with procedural norms or because prison officials were exempt from the requirements of the state's administrative rules. The disposition in *Parker* of the question whether the non-enforceable statements

create liberty interests is therefore of uncertain authority. Against *Lucas* and *Parker* there stands the Second Circuit's post-*Dumschat* position—which may also be dictum—that a written statement of policy that is not "grounded in the state's statutory scheme" does not afford prisoners a liberty or property interest. *Berard v. Vermont Parole Board*, 730 F.2d 71, 73 (2d Cir.1984). Our opinion in *Mathews* is to the same effect.

 The essential underpinning of *Parker* and the majority in *Lucas*, which Miller embraces, is that the Constitution contains a Law of the Excluded Middle. In this view there are only two possibilities: rules that mention criteria of decision and therefore create liberty or property interests, and vague standards (written or not) that leave unfettered discretion. We conclude that the Constitution does not forbid a third alternative: written rules that create no entitlements and no hearings. That is what we have. The manual was not promulgated under the Administrative Procedure Act or published in the Code of Federal Regulations, and therefore it does not create legally enforceable entitlements. See, e.g., *Chrysler Corp. v. Brown*, 441 U.S. 281, 312–16, 99 S.Ct. 1705, 1723–25, 60 L.Ed.2d 208 (1979); *Hansen*, 450 U.S. at 789, 101 S.Ct. at 1471; *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536–39 (D.C.Cir.1986) (Scalia, J.); *Thomas v. New York*, 802 F.2d 1443 (D.C.Cir.1986) (Scalia, J.). Whether or not the agency makes its rules known, these create entitlements (meaning something that may be enforced to prevent substantive transgressions) only if adopted in one of the ways the APA prescribes. As *Cathedral Bluffs* holds, a policy manual that contains criteria for action but is not a "rule" within the meaning of the APA does not fetter the discretion of the agency. It is interpretive rather than legislative. See 5 U.S.C. § 553(b)(A). Cf. *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (although agencies must follow their own regulations, they may choose their own sanctions for breaches of statements of policy); *Thomas v. New York* (only documents issued after notice and opportunity for comment create substantive entitlements binding on an agency).

The Bureau of Prisons has not promulgated its assignment policies as a rule under the APA. (Miller does not contend that the APA requires the publication or formal adoption as rules of the Bureau's criteria. Cf. *Morton v. Ruiz*, 415 U.S. 199, 232–37, 94 S.Ct. 1055, 1073–75, 39 L.Ed.2d 270 (1974).) They are not in the Code of Federal Regulations, that repository of rules with legal effects. *Cathedral Bluffs*, 796 F.2d at 539. The secrecy ensures that prisoners acquire no expectations, "mutual" or otherwise. See *Leis v. Flynt*, 439 U.S. 438, 442, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979) ("A claim of entitlement ..., to be enforceable, must be derived from statute or legal rule or through a mutually explicit understanding."). And certainly the Bureau's policies create no contractual rights of the sort that *Roth* held are "property". See also *Bishop v. Wood*, 426 U.S. 341, 344–47, 96 S.Ct. 2074, 2077–78, 48 L.Ed.2d 684 (1976).

The Supreme Court's many holdings that the due process clause does not require hearings when there is no "legitimate claim of entitlement" show that when there are no binding substantive criteria, when a decision cannot be "wrong", it is unnecessary to foist hearings on the decisionmaker. The function of procedure is to increase the likelihood that decisions concerning substantive entitlements will be accurate. *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976). There are two sorts of reasons why there may be no substantive entitlements (and therefore no right to hearings): (a) there may be no rules at all, and (b) the "rules" may be legally unenforceable, hortatory, empty. Cases such as *Dumschat* present the former situation, ours the latter. They are constitutionally indistinguishable. In either event the decisionmaker's discretion is complete. Unenforceable "rules" effectively end with a clause stating: "The decisionmaker may disregard any of the above

at his unreviewable option." * In either case—no rules or unenforceable rules—nothing turns on determinable facts. Because the officer need not pay attention to the claimant's demands, the government may do as it pleases. A person turned away without hearing has lost nothing to which his claim was better than anyone else's.

The regulations at issue in *Hewitt* made some claims better than others. They had been published and explicitly limited the discretion of the jail officials. Nothing of the sort has happened here. The documents guide the staff rather than the prisoners. The Bureau wants (the introduction to Program Statement 5100.2 says) its "staff to use *professional judgment within specific guidelines.* The system was designed to emphasize staff flexibility in decision-making, yet provide a basis for more *consistent* decision-making across the Federal Bureau of Prisons." (Emphasis in original.) A jailer who gives erratic and unreliable classifications may have to answer to the Attorney General, but he does not have to answer to Miller.

This is not a replay of the argument that a claimant must "take the bitter with the sweet", *Arnett v. Kennedy,* 416 U.S. 134, 154, 94 S.Ct. 1633, 1644, 40 L.Ed.2d 15 (1974) (plurality opinion), must accept the absence of procedures in order to receive favorable substantive rules. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 539–41, 105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494 (1985), holds that if there is a legitimate claim of entitlement under a statute or rule, then the Constitution establishes the minimum procedures. Our question, in contrast, is whether all written statements with an "if ... then" construction create legitimate claims of entitlement. We hold that they do not. Because the documents are designed to bind the staff of the Bureau of Prisons to the Attorney General's will, rather than to create claims of entitlement, they do not establish a liberty or property interest.

Finally, Miller relies on *Bono v. Saxbe,* 620 F.2d 609, 612 (7th Cir.1980), for the proposition that the imposition of extra controls on prisoners at Marion is subject to review for compliance with substantive due process. The nub of a substantive due process claim is that some things the state just cannot do, no matter how much process it provides. See *Daniels v. Williams,* —— U.S. ——, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986); see also *id.* at 678 (Stevens, J., concurring). The panel in *Bono* thought that extended segregation was such a thing, and therefore that judges must scrutinize the reasons for placing any given prisoner in segregation. It might follow that if there *must* be "good reasons" then there are substantive rules of decision and an entitlement to process.

The extent to which prisoners have substantive interests that do not depend on statutes and binding regulations has been a difficult problem for the Supreme Court. *Vitek* shows that there are some such interests, portions of a person's natural liberty not extinguished by the judgment of conviction. Other substantive interests may stem directly from provisions of the Constitution. The rights to speech and the free exercise of religion are in this category. *Hewitt,* which was decided after *Bono,* holds that there is no substantive entitlement to be placed in a prison's general

---

* Sometimes such a clause exists in rules published under the APA. For example, published rules govern applications for presidential pardons, but the last rule, 28 C.F.R. § 1.10, states: "The regulations contained in this part are advisory only and ... create no enforceable rights in persons applying for executive clemency, nor do they restrict the authority granted to the President under Article II, Section 2 of the Constitution." Sometimes courts treat even formally adopted rules as if they had such clauses. The regulations of the IRS, which are adopted under the APA, may be varied summarily and retroactively. See *Dickman v. CIR,* 465 U.S. 330, 343, 104 S.Ct. 1086, 1094, 79 L.Ed.2d 343 (1984); *Dixon v. United States,* 381 U.S. 68, 70–71, 85 S.Ct. 1301, 1302–03, 14 L.Ed.2d 223 (1965); *Ward v. CIR,* 784 F.2d 1424, 1430–31 (9th Cir.1986). We think it sensible to treat internal manuals of the Bureau of Prisons as containing such clauses too—both because of the nature of the subject matter and because legal unenforceability is the same as such a clause.

population rather than in segregated confinement. We need not deal here with a claim that certain reasons for placing a prisoner in segregation are substantively forbidden; Miller does not contend that the reasons for placing him in segregation are off limits to prison officials. *Hewitt* shows that, in a case of this character, there is no broader substantive entitlement. It is not necessary to venture further into ground that the Supreme Court has hesitated to survey.

AFFIRMED.