Ronnie **BRUSCINO**, et al., Plaintiffs,

v.

Norman **CARLSON**, et al., Defendants.

Civ. No. 84–4320.

United States District Court,
S.D. Illinois,
Benton Division.

Feb. 25, 1987.

Nancy Horgan, Donna Kolb, James Roberts, Carbondale, Ill., for plaintiffs.

Ralph Friederich, Asst. U.S. Atty., East St. Louis, Ill., for defendants.

## MEMORANDUM AND ORDER

FOREMAN, Chief Judge:

This case is before the Court on a Report and Recommendation of Magistrate Kenneth J. Meyers that plaintiffs' "Motion for Preliminary Relief Re Brutality" and "Motion for Preliminary Relief Re Conditions" be denied. Plaintiffs have filed objections to this recommendation and therefore, pursuant to 28 U.S.C. § 636(b)(1)(C), this Court will make a *de novo* review of those portions of the recommendation to which objections were made.

## BACKGROUND

On July 24, 1984, plaintiffs filed a complaint in which they requested injunctive, monetary, and other relief for alleged violations of their constitutional rights. This Court certified the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on August 1, 1985.[1] The class was defined as "all prisoners who are confined at Marion Penitentiary or who may in the future be confined at Marion Penitentiary." Defendants are present and past employees of the Federal Bureau of Prisons.

Plaintiffs complain of the use of excessive force, the performance of rectal searches, the amount of time prisoners must spend in their cells, the procedures by which prisoners are placed at and transferred to Marion, and various other conditions that have existed at Marion since the "lockdown" began in November, 1983. They allege that the above practices and conditions violate specified constitutional rights, primarily the right to be free from cruel and unusual punishment, and the right to due process of law.

Testimony on plaintiffs' request for preliminary injunctive relief began in January, 1985 and continued for nearly twenty-eight days. The Magistrate heard testimony from approximately ninety witnesses and received into evidence approximately 150 exhibits, which consisted of several thousand pages of material. The Magistrate's Report and Recommendation included, but was not limited to, a discussion of the following issues: 1) Whether defendants engaged in a systematic pattern and practice of physical brutality in violation of the eighth amendment, 2) whether the policy with regard to rectal searches violates the eighth amendment, 3) whether the procedures by which prisoners are placed at and transferred to Marion violate the eighth

---

1. Class certification applied only to the injunctive portion of this case.

amendment and the right to due process, 4) whether the amount of time prisoners spend in their cells is constitutionally permissible, 5) whether the use of physical restraints violates the eighth amendment, 6) whether prisoners are denied access to the courts and to legal materials, 7) whether prisoners are denied the right to practice their religion, and 8) whether the denial of contact visits violates the inmates' constitutional rights. In a 166 page Recommendation, the Magistrate found that the individual practices and conditions of which plaintiffs complain did not violate any constitutional rights, and that the conditions, even when considered together, were not violative of the eighth amendment.

On October 10, 1985, this Court ordered that a transcript of the proceedings be prepared and sent to the Court for its review. Additionally, the Court held four days of hearings, from December 16, 1986 to December 19, 1986, in order to obtain an update on the conditions at Marion and in order that it be informed of any changes occurring at Marion since the hearings held before the Magistrate. The parties agreed upon a consolidation of the request for a preliminary injunction and the request for a permanent injunction, and that the hearing in December, 1986 would be a final hearing on both requests.

Prior to the scheduled hearings in this case, the Court held several pretrial conferences. At these conferences, the Court told counsel for plaintiffs and defendants that it would make a surprise visit to Marion. Counsel made no objections and in fact, appeared to agree that such a visit was a good idea.

My law clerks and I made an unannounced visit and toured the institution on December 11, 1986. We were accompanied by one of the attorneys for plaintiffs and the attorney representing defendants. The tour included a visit to the law library, dining room, visiting rooms, the industry area where prisoners from certain units are allowed to work, the prison chapels, and the exercise and recreational areas. The Court also toured the Control Unit, the

disciplinary segregation unit, and part of the general population units. While the Court did not actually tour B Unit (more fully described below), the Court was able to observe the movement and mingling of prisoners in that particular unit. The tour not only provided an update on the conditions at Marion, but more importantly, aided the Court in understanding the testimony and the specific issues involved in this case.

## OBJECTIONS

In a section entitled "General Objections to the Report," plaintiffs make various generalized objections regarding the Magistrate's ability to be fair and impartial. The Court initially notes that Local Rule 32(b) requires *specific* objections to a report and recommendation. Furthermore, other courts have held that "a district court need not conduct a *de novo* determination if objections are not timely or *not specific.*" *Goney v. Clark,* 749 F.2d 5, 6–7 (3d Cir.1984) (emphasis added). *See also Nettles v. Wainwright,* 677 F.2d 404, 410 n. 8 (5th Cir.1982). Therefore, this Court need not even consider the general objections set forth by plaintiffs. However, in the interests of justice and in order that its review of the proceedings be complete, the Court has considered those general objections raised by plaintiffs. The Court agrees that the Magistrate's praise of certain government witnesses was perhaps unnecessary. Also, the Magistrate's comments to plaintiffs' counsel, as well as his comments regarding plaintiffs' witnesses and certain testimony plaintiffs attempted to present, were *at times* unnecessarily harsh. At the same time, the Magistrate was obviously interested in moving the case along. In any event, the Court finds, from an overall review of the proceedings, that the Magistrate functioned as an impartial decision-maker, and that plaintiffs were given a fair hearing.

Plaintiffs have also set forth twenty-four pages of "specific objections." Some of these objections are, however, framed in general, vague and broad terms, and are

therefore difficult, if not impossible, to consider and review in any meaningful way. For example, in objections No. 7 and No. 9, plaintiffs state as follows:

7. The discussion of x-rays is spurious and ignores the evidence. The proper inference to draw is that plaintiffs want the relief requested, that potential health hazards be considered, and that their constitutional rights be respected.

9. In almost all of the remaining issues discussed in the report, plaintiffs' challenges are misstated and belittled. Plaintiffs challenge the failure to provide adequate medical care when the omission occurs, and produced ample evidence to support their claim. Plaintiffs appreciate and applaud competent medical care when it is provided. Plaintiffs do not challenge the hobbycraft policies, package policies, or toilet paper policies, except as they relate to the totality of conditions and are vehicles for harrassment by guards.

The psychological damage of brutality and the conditions of confinement was the subject of much testimony, both direct and expert. The evidence is completely disregarded by the magistrate, although it is a central issue in the litigation. The report reduces the matter to a challenge to the unavailability of psychiatric services. Not even defendants claimed that psychological counseling is available to prisoners. Even if counseling were available, that in no way justifies the perpetration of the serious harm which continues today as a result of incarceration at Marion.

Inadequacy of the law library, access to typewriters and copying, and difficulties associated with legal visits, all are related to plaintiffs [sic] rights of access to court. These issues arose in testimony only incidentally, as elements to be considered in the totality of conditions. The testimony was restricted, and the magistrate has not had the benefit of a full and complete presentation of the evidence on which to base his conclusions.

Those specific objections that were raised, however, have been carefully considered by this Court in reviewing the record of proceedings and in reaching its decision.

Since plaintiffs appear to object to virtually the entire Report and Recommendation, the Court has reviewed not only the Magistrate's Recommendation, but over 4,000 pages of transcript, as well as numerous exhibits. After thoroughly reviewing the record in this case and after hearing four days of additional testimony, the Court concludes that 1) the Magistrate's findings are supported by the evidence in the record; and 2) the Magistrate correctly determined that the conditions at Marion, alone or in combination, do not violate the Constitution. The Court will not repeat the legal analysis, with regard to each specific issue, that is set forth in the Report and Recommendation, but will discuss those issues that, for various reasons, merit further attention.

## CREDIBILITY DETERMINATIONS OF THE MAGISTRATE

Many of the Magistrate's findings, particularly with regard to plaintiffs' allegations that beatings had occurred, were based on his determination that certain prisoners were not credible witnesses. In reviewing credibility determinations of the Magistrate, the district court "is not required to hear any witness and not required to hold a *de novo* hearing of the case." *U.S. v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 2412–13, 65 L.Ed.2d 424 (1980). As stated by the Seventh Circuit:

*Raddatz* made it clear that the district court, in making its *de novo* determination of the record, could afford the magistrate credibility findings " 'such weight as [their] merit commands and the sound discretion of the judge warrants.' " Thus, on appeal, the district court's decision to adopt the magistrate's credibility rulings without hearing the testimony can only be said to be [an] abuse of discretion if the record reflects that those rulings were themselves clearly erroneous and entitled to no weight.

*U.S. v. Hardin,* 710 F.2d 1231, 1235 (7th Cir.1983), *cert. den.* 464 U.S. 918, 104 S.Ct. 286, 78 L.Ed.2d 263 (1983). *See also McChristion v. Duckworth,* 610 F.Supp. 791, 797 (N.D.Ind.1985).

In the instant case, the Court had an opportunity to evaluate the credibility of the witnesses when it reviewed the record. The Court finds that the Magistrate's credibility determinations are amply supported by the record, and those determinations are therefore accepted by this Court.

### BEATINGS AND THE USE OF PHYSICAL RESTRAINTS

The Magistrate made extensive findings with regard to the issue of whether beatings occurred and with regard to the use of physical restraints. The Court concludes that these findings are supported by the evidence in the record.

 With specific regard to the use of forced cell moves, the evidence presented to this Court during the December, 1986 hearings further supports the conclusion that excessive force is not used during these moves. The Court viewed a tape showing the forced cell moves of several different prisoners and the method by which some of the prisoners were restrained. Based on its review of all of the evidence relating to these moves and to the use of restraints, the Court can only conclude that the use of force was justified in these situations and was clearly not excessive. Although plaintiffs argue that defendants' use of force and restraints violates the Code of Federal Regulations, plaintiffs fail to recognize those Code provisions that give prison officials a certain amount of discretion in determining how much force to use and whether restraints are necessary. Section 552.22 allows prison staff to use "only that force *necessary to gain control of the inmate.*" 28 C.F.R. § 552.22 (1986) (emphasis added). The Code further provides:

(a) The correctional supervisor in charge of the shift may authorize and will ordinarily supervise the application of restraints necessary to gain control of an inmate who appears to be dangerous because:

(1) The inmate assaults any person;

(2) The inmate destroys government property;

(3) The inmate attempts suicide;

(4) The inmate inflicts wounds upon self; or

(5) *The inmate displays signs that such violence may be imminent.*

28 C.F.R. § 552.21(a)(1986) (emphasis added). Therefore, the Court finds that the use of force and restraints is constitutionally acceptable and in conformance with the Code of Federal Regulations.[2]

### OUT OF CELL TIME

 Plaintiffs contend that the restrictions on recreation and exercise time violate the eighth amendment. Inmates in disciplinary segregation (I Unit) and inmates in protective custody (G Unit) are allowed five hours exercise per week outside of their cells. Prisoners in the Control Unit (H Unit) are permitted seven hours exercise per week. General population inmates (D, E and F Units) receive eleven hours of exercise per week, four hours out of the cellblock (including two hours outdoors) and seven hours on the cellblock range. Inmates in B Unit are allowed out of their cells from morning until 10:00 p.m. The amount of time that C Unit inmates are allowed out of their cells is not exactly clear, but as noted by the Magistrate, it is something more than general population inmates and something less than B Unit inmates.

A recent Seventh Circuit case clearly supports a finding that the restrictions on recreation do not violate the Constitution. In *Caldwell v. Miller,* 790 F.2d 589 (7th Cir.1986), plaintiff alleged that the exercise

---

**2.** The Court agrees that restraining inmates to beds for prolonged periods without checking them every thirty minutes is violative of the Code. The evidence shows, however, that these incidents were isolated incidents, that there was no policy or practice of such abuse, and thus, that no constitutional violation requiring injunctive relief is warranted.

restrictions in effect at Marion constituted cruel and unusual punishment in violation of the eighth amendment. The court held that while these restrictions resulted in "inconvenience and discomfort," they did not violate the eighth amendment. According to the court, "[t]he restriction that [plaintiff] may exercise outside his cell for one hour a day falls short of demonstrating a deliberate indifference to his serious medical needs ... Nor can we say that the restriction[s] are totally without penological justification." *Id.* at 601. "The Constitution does not mandate that prisons be comfortable, and a prison such as Marion, which houses persons convicted of serious crimes and who have demonstrated a propensity to violence or escape, cannot be free of discomfort." *Id.* Accordingly, the Court finds that the amount of "out of cell time" granted to prisoners for exercise and recreation is constitutionally acceptable, and that the imposed restrictions do not violate the eighth amendment.

## PLACEMENT AND TRANSFER

■ As noted by the Magistrate in his Report and Recommendation, plaintiffs challenge placement at Marion in various contexts: 1) initial placement at and/or transfer to Marion, 2) lack of availability of transfer from Marion's general population to another institution, 3) transfer from Marion's Control Unit to general population, and 4) the procedures for acceptance in B Unit.[3] The Court adopts the Magistrate's rulings on these issues. With regard to the question of initial placement at and/or transfer to Marion, the Court additionally notes the following.

Plaintiffs argue that the lockdown restrictions have created an institution that is, in actuality, an extension of the Control Unit. Plaintiffs contend that because Control Unit prisoners are given a hearing before placement in that Unit, general population inmates (those in D, E and F Units) are likewise entitled to a hearing prior to placement at Marion. The Court rejects plaintiffs' analysis for two reasons.

First, there are distinct differences between the conditions of confinement in D, E and F Units and conditions of confinement in the Control Unit. For example, inmates in the Control Unit are permitted only seven hours of exercise per week, while general population inmates receive eleven hours of exercise per week, including two hours of outdoor exercise. The evidence before the Magistrate and before this Court also showed that Control Unit inmates are restrained with handcuffs, a black box[4] and leg restraints during visits, while general population inmates visit without restraints. Furthermore, Control Unit inmates are not allowed to attend group religious services, while general population inmates may attend group services once per month. Finally, Control Unit inmates are subjected to rectal searches, without the existence of reasonable suspicion, when they reenter that Unit after leaving the institution. An inmate in general population, however, may be given a rectal search only if there is reasonable suspicion that he is concealing contraband. (The issue of rectal examinations is discussed in a subsequent section of the opinion.)

Second, the Seventh Circuit has expressly held that the lockdown restrictions at Marion do not implicate a protected liberty interest, *Caldwell*, 790 F.2d at 605, and that "the Constitution does not require hearings before transfers to Marion." *Miller v. Henman*, 804 F.2d 421, 423 (7th Cir.1986). The plaintiff in *Caldwell* claimed that the continuation of the lockdown, with no opportunity to challenge it, violated his right to procedural due process under the fifth amendment. The court held:

---

3. Prisoners in B Unit are allowed out of their cells for most of the day and participate in a work program now in effect at the institution. It is from B Unit that prisoners are transferred to other institutions.

4. A black box is a small box that fits over the chain connecting the two cuffs and that is designed to prevent an inmate from picking the lock on the handcuffs.

The difference between the pre- and post-lockdown conditions at Marion is one of degree and not of kind. *Even assuming that the lockdown restrictions are permanent, it cannot be said that they brought about conditions of confinement that are qualitatively different from the punishment characteristically suffered by a convict.*

*Caldwell*, 790 F.2d at 604–05 (emphasis added).

In a similar vein, the plaintiff in *Miller* claimed that the due process clause requires a hearing before placement at Marion. Specifically, plaintiff argued that 1) Marion, as a locked-down maximum security prison, is qualitatively different from all others, and therefore, due process requires a hearing before placement at Marion; 2) various policy statements promulgated by the Bureau of Prisons created constitutionally protected interests, which in turn require a hearing; and 3) under *Bono v. Saxbe*, 620 F.2d 609 (7th Cir.1980), "the imposition of extra controls on prisoners at Marion is subject to review for compliance with substantive due process." *Miller*, 804 F.2d at 427. The Seventh Circuit expressly held that no hearing is required before an inmate is placed at or transferred to Marion. *Id.* at 423, 427–28. In so ruling, the court noted the Supreme Court's decision in *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and based on that decision, appeared to reject plaintiff's reliance on *Bono v. Saxbe*:

> *Hewitt*, which was decided after *Bono*, holds that there is no substantive entitlement to be placed in a prison's general population rather than in segregated confinement. We need not deal here with a claim that certain reasons for placing a prisoner in segregation are substantively forbidden; Miller does not contend that the reasons for placing him in segregation are off limits to prison officials. *Hewitt* shows that, in a case of this character, there is no broader substantive entitlement.

*Id.* at 427–28. Thus, according to Supreme Court decisions and based on recent Seventh Circuit cases, plaintiffs have no right to a hearing before placement at and/or transfer to Marion.

## ACCESS TO COURTS

Plaintiffs contend that the legal access program at Marion is constitutionally inadequate. Under the current system, satellite or "mini law libraries" are maintained on each range and are available for inmate use. Prisoners cannot use the main law library, but may request specific materials from that library, and may keep the requested materials for twenty-four hours.[5] The testimony before this Court indicated that inmates experience delays in receiving books and other legal materials, and that research is more difficult without direct access to the main law library.

The Seventh Circuit, however, has expressly held that Marion's legal access program is constitutionally adequate, and that "the lack of direct access to the main law library does not *per se* render a legal-access program unconstitutional." *Caldwell*, 790 F.2d at 606. *See also Campbell v. Miller*, 787 F.2d 217, 226–30 (7th Cir.1986) (attorney visitation restrictions at Marion, limited direct access to the Control Unit law library, the requirement of a visual body-cavity search before and after using the library, the "exact-cite" paging system for requesting legal materials, and the lack of an established legal assistance program all upheld as constitutional). As stated in *Caldwell*:

> Restrictions on direct access to legal materials may be justified in light of legitimate security considerations.... Marion presents unique disciplinary and security considerations. This is true whether one is dealing with general population inmates or with those in the Control Unit. Because we find that the direct-access restrictions do not render Caldwell's access to the courts, as a gen-

---

**5.** According to the testimony of Lawrence Caldwell, prisoners may request three volumes at one time from the main library. It appears that

Control Unit inmates may request only two at a time.

eral matter, unmeaningful, and that these restrictions are supported by legitimate security considerations, we will defer to the judgment of Marion officials in adopting the procedures they have. *Caldwell*, 790 F.2d at 606.

■ Plaintiffs also complain that 1) when an attorney arrives for a visit at Marion, there are sometimes substantial delays before that attorney is allowed to see his or her client; and 2) the restraints Control Unit inmates are placed in during legal visits prevent any meaningful communication between the attorney and client. Testimony before this Court indicated that attorneys must wait fifteen to twenty minutes before seeing their client, and that the wait had, at times, been two to three hours. However, Donna Kolb, one of the attorneys for plaintiffs in this case, testified on cross examination that she was never unable to meet court deadlines because of these delays, that she was never refused an opportunity to prepare a client for trial, and that she had, at times, been permitted to visit clients on non-visiting days. The Court understands the inconvenience that results from these type of delays. Nevertheless, "reasonable delay and inconvenience do not rise to the level of a constitutional deficiency," *Campbell*, 787 F.2d at 229, especially in view of Ms. Kolb's testimony that there has been no actual prejudice as a result thereof.

■ With respect to plaintiffs' complaint that Control Unit inmates are unnecessarily restrained during attorney client visits, the Court likewise finds no constitutional violation. As previously noted, Control Unit inmates are restrained with handcuffs, a black box and leg restraints during visits. Plaintiffs contend that these restraints, particularly the black box, not only cause great discomfort, but also make it very difficult to write and to pass papers back and forth, and generally, to meaningfully communicate with their attorney. During hearings before this Court, Jerry Williford, the former warden at Marion, stated that various inmates had previously testified that, if they wanted to, they could unlock the handcuffs quickly. (The black box prevents inmates from doing so.) This testimony was apparently the primary reason that Control Unit inmates are now required to wear black boxes during visits. Although plaintiffs contend that there are other means of providing security, it is not within the province of this Court to determine whether one security measure is as effective as another. In the absence of some constitutional violation, those decisions are best left to prison administrators. Thus, while the Court appreciates the inconvenience and discomfort plaintiffs must experience because of these restrictions, the Court can only conclude that the security concerns of prison administrators justify the measures that have been taken. The court in *Campbell* repeatedly referred to restrictions that "implicate legitimate security and disciplinary concerns" in upholding the constitutionality of Marion's legal access program. *Campbell*, 787 F.2d at 228. Similarly, the Court here finds that because of expressed security concerns, restraining Control Unit inmates with cuffs, a black box and leg restraints during legal visits does not violate their right of access to the courts or any other constitutional right.

## INTERFERENCE WITH MAIL

In his testimony before this Court, Lawrence Caldwell, an inmate at Marion, stated that several pieces of his legal mail were opened outside of his presence. The Code of Federal Regulations provides:

> The Warden shall open incoming special mail only in the presence of the inmate.... The correspondence may not be read or copied if the sender is adequately identified on the envelope, *and* the front of the envelope is marked "Special Mail—Open only in the presence of the inmate."

> In the absence of either adequate identification or the "special mail" marking ... on the envelope, staff may treat the mail as general correspondence and may open, inspect and read the mail.

28 C.F.R. § 540.18(a) & (b) (1986) (emphasis added).

With regard to legal correspondence, the Code provides, "Legal mail shall be opened in accordance with special mail procedures (see § 540.18)." 28 C.F.R. § 540.19(b) (1986). The Code further provides that "[t]he inmate is responsible for advising any attorney that correspondence will be handled as special mail only if the envelope is marked with the attorney's name ... and the front of the envelope is marked "Special Mail—Open only in the presence of the inmate." *Id.*

 None of the envelopes presented to this Court as exhibits were marked "Special Mail" as required by the Code of Federal Regulations. Although it was obvious from some of the return addresses that the mail was legal mail, prison officials clearly did not violate any Code provision by opening mail that was not properly marked. Furthermore, although there were isolated incidents of interference with legal mail and although the Court in no way condones the improper handling of legal mail, the evidence does not show a systematic pattern or practice of interference. In the absence of such a showing, the Court finds that no constitutional violation occurred and that injunctive relief is not warranted.

## FREEDOM OF RELIGION

According to the testimony of the Catholic priest at Marion, Father Gavin O'Conner, Marion employs two full time chaplains (a Catholic priest and a Southern Baptist minister), as well as five part time "contract" ministers (a Jewish Rabbi, a Muslim Imam, ministers from the Moorish Science Temple faith, a Medicine Man or Pipe Handler for the Native American Indians, and Catholic and Protestant replacements if needed). General population inmates (C, D, E and F Units) are permitted to attend group religious services once per month, and B Unit inmates are allowed to attend group services a minimum of once per week. In addition, the full time chaplains walk the ranges in C, D, E and F Units once per week and the contract ministers walk the ranges once per month. Those inmates in the segregation units (G, H and I Units) are not permitted to attend group services. The staff chaplains, however, visit these inmates once per week in their cells for prayer time and for communion and confession, if desired. The contract ministers also walk the ranges in G, H and I Units and are allowed to visit segregation unit inmates in the attorney booths in the visiting room, although there was testimony that the contract ministers cannot always see everyone because of their limited time.

It is well settled that while prisoners retain complete freedom of religious belief, their freedom to exercise those beliefs is subject to curtailment. *Cooper v. Pate,* 382 F.2d 518, 521 (7th Cir.1967). "Prison rules that restrain the free exercise of religion are justified only if they are 'reasonably adapted' to achieving an important penological objective." *Caldwell,* 790 F.2d at 596.

 Restrictions on group religious services for inmates in disciplinary segregation are constitutionally permissible as long as adequate alternatives are available. *See Arsberry v. Sielaff,* 586 F.2d 37, 44 (7th Cir.1978) (cited with approval in *Caldwell,* 790 F.2d at 598). In the present case, inmates in disciplinary segregation, though denied group services, are offered, for example, prayer time, communion and confession once per week when the staff chaplains make cell visitations, and once per month through the contract ministers. In addition, it appears that Control Unit inmates can watch religious services over closed circuit television. The Court finds that these are adequate alternatives to actual participation in group services.

 Testimony before the Magistrate indicated that general population inmates can attend group services only with those prisoners who reside on the same side of a particular unit. Patrick Keohane, a former assistant warden at Marion, testified that the reason for this policy was to separate inmates who might harm one another. Furthermore, there is ample evidence in the

record of legitimate security needs that justify restrictions on group activities at Marion. These security concerns clearly justify a restriction that limits group religious services to once per month for general population inmates. As stated in *Caldwell*, prison officials need only show that such services "constitute a threat of potential violence or are disruptive of institutional security." *Caldwell*, 790 F.2d at 599. This the defendants have done. The Court therefore finds that plaintiffs' first amendment rights have not been violated.

## RECTAL SEARCHES

The policy with regard to rectal searches or digital examinations at Marion is as follows. General population inmates may be given a rectal search "only by designated qualified health personnel ... and only if the Warden or Acting Warden has *reasonable belief* that an inmate is concealing contraband in or on his person." 28 C.F.R. § 552.11(c) (1986) (emphasis added). A Control Unit inmate is given a rectal search every time he reenters the Control Unit "following contact with the public." 28 C.F.R. § 541.48(a) (1986). According to the testimony, this means that whenever a Control Unit inmate leaves the institution and then reenters the Control Unit, he may be given a rectal search even in the absence of reasonable suspicion. In all other situations, however, the standard that applies to general population inmates also applies to Control Unit inmates—there must be reasonable suspicion that a prisoner is concealing contraband before a rectal search is performed. Inmates may request that an x-ray be taken in lieu of the digital search. *See* 28 C.F.R. § 541.48(b) (1986). According to the testimony before this Court, an inmate may request a maximum of only two x-rays per year because of obvious health reasons. However, Jerry Williford testified that at the time he was warden, there were only two inmates who would have exceeded the maximum number of permitted x-rays.

6. Cases discussing this issue have been analyzed in terms of both the fourth and eighth amend-

Plaintiffs contend that the policy of conducting rectal searches on Control Unit inmates without any level of suspicion violates the eighth amendment's prohibition against cruel and unusual punishment. In their objections to the Magistrate's Recommendation, plaintiffs also state that "[t]he manner in which rectal searches have been done at Marion is offensive at best, and shocks the conscience of impartial observers." (Plaintiffs' Objections, p. 8).

As noted by the Magistrate, the Supreme Court has not yet addressed the issue of physical rectal searches. However, in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court held that a strip search policy requiring all inmates to submit to a visual body cavity inspection after every contact visit did not violate the fourth amendment.[6] The court applied a balancing test, stating that:

> The test of reasonableness under the Fourth Amendment ... requires a balancing of the need for the particular search against the invasion of the personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* Similarly, in *Goff v. Nix*, 803 F.2d 358 (8th Cir.1986), plaintiffs challenged several aspects of the institution's strip search policy, including a provision that required segregation unit inmates to be given a visual body cavity search every time they entered or left the institution. The court, noting the legitimate and serious security needs of the prison, held that the policy violated neither the fourth or eighth amendment. *Id.* at 364, 371. Likewise, in *Arruda v. Fair*, 710 F.2d 886 (1st Cir.1983), inmates in a special maximum security unit within MCI–Walpole (a Massachusetts maximum security prison) challenged the prison's policy of strip-searching those particular in-

ments.

mates whenever they entered or left the unit on their way to or from the law library and infirmary, and after visits. (The search was apparently similar to that in *Bell v. Wolfish.*) The court held that the strip search policy did not violate either the fourth or eighth amendment. *Id.* at 887–88. The court further noted that the searches were even more reasonable than those in *Bell* since the institution was a maximum security facility "designed to hold those inmates who pose the greatest risks to society and to each other." *Id.* at 887. Finally, the Court notes with interest the Seventh Circuit's decision in *Campbell v. Miller.* Plaintiff, a Marion inmate housed in the Control Unit, challenged the policy that required him to submit to a routine visual body cavity search both before and after using the Control Unit library. The court upheld this policy as constitutional, noting that the "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Campbell,* 787 F.2d at 228.

At least one circuit has addressed the issue of whether rectal searches are constitutionally permissible. The plaintiffs in *Daughtery v. Harris,* 476 F.2d 292 (10th Cir.1973) challenged a policy at USP–Leavenworth that required routine rectal examinations before prisoners were released to the United States Marshal for court appearances. The court specifically noted the security considerations at an institution such as Leavenworth and the number of times that contraband was concealed in the rectal cavity. In upholding the constitutionality of the policy at issue, the court concluded that "the rectal searches ... were, and are, a necessary and reasonable concomitance of appellants' imprisonment." *Id.* at 295.

 The Court is completely aware that, with the exception of *Daughtery,* the above cases involved visual body cavity searches and not actual physical rectal examinations. However, the Court believes that the rationale of those cases can be extended to uphold the constitutionality of the rectal search policy at issue in the present case. The security concerns repeatedly noted in the various decisions are certainly present at Marion, the highest level maximum security prison in the federal penitentiary system. In this regard, the Court is particularly mindful of the judicial deference that must be accorded prison officials in matters of institutional security. Moreover, like the maximum security unit inmates in *Arruda,* the Control Unit inmates obviously require greater supervision than other prisoners. This fact further justifies rectal examinations when an inmate reenters the Control Unit (after leaving the institution) even though there may be no reasonable suspicion that a particular inmate is concealing contraband.

In addition, the parties do not dispute, and the evidence shows, that inmates at Marion have indeed used the rectal cavity for hiding contraband. Plaintiffs appear to contend that Control Unit inmates have no opportunity to obtain or conceal contraband when they leave the institution for court appearances since they are shackled and closely guarded. The Court, however, agrees with the following observation:

[T]rips outside the confines of the prison for court appearances raise ... serious security problems. Friends or relatives of the inmate frequently are aware of court dates. While inmates may be well guarded and closely observed, the public nature of courts and the frequently crowded surroundings make the presence of a weapon that the inmate has managed to smuggle with him or that someone else has managed to secrete for him particularly dangerous.

*Goff,* 803 F.2d at 368. Furthermore, the evidence before this Court included a July, 1985 video tape of two prisoners, Randy Gometz and John Greschner, who were caught with contraband (including hacksaw blades) in their noses. This type of evidence clearly demonstrates that, even since the lockdown, inmates are still somehow able to obtain contraband and are still attempting to hide the contraband in body cavities. Such security concerns certainly justify the rectal search policy now in effect at Marion.

■ With specific regard to plaintiffs' eighth amendment claim, the Court finds nothing in the record to support a contention that the searches in question constitute cruel and unusual punishment. The Magistrate found that according to the credible evidence, "rectal searches are conducted in a professional manner" and "neither physical nor verbal abuse occurred during rectal searches." (Report and Recommendation p. 41). Based upon this evidence and upon the factors noted above, the Court finds that the rectal searches at Marion do not constitute an unnecessary and wanton infliction of pain within the meaning of the eighth amendment, and that the rectal search policy as applied to Control Unit inmates is constitutionally acceptable.

## TOTALITY OF CONDITIONS

Plaintiffs contend that the totality of conditions at Marion constitutes cruel and unusual punishment in violation of the eighth amendment. The Magistrate has already discussed this issue. The Court would like to highlight certain portions of that discussion, note any recent decisions on this particular issue, and discuss additional pertinent testimony that was presented during the hearings before this Court.

In *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Court recognized the "totality of conditions" approach to eighth amendment claims when it stated that "[c]onditions ... alone *or in combination*, may deprive inmates of the minimal civilized measure of life's necessities." *Id.* at 347, 101 S.Ct. at 2399 (emphasis added). The Seventh Circuit, however, has not interpreted *Rhodes* "to allow a number of otherwise unquestionably constitutional conditions to become unconstitutional by their aggregation." *Madyun v. Thompson*, 657 F.2d 868, 874 n. 10 (7th Cir.1981). In this regard, the Seventh Circuit has held that "[v]ague conclusions that the totality of conditions amounts to a constitutional violation ...

are insufficient." *Smith v. Fairman*, 690 F.2d 122, 125 (7th Cir.1982).

The Court has already held that specific conditions at Marion, when viewed separately and individually, do not violate the Constitution. Under *Madyun*, the Court cannot find that these "otherwise unquestionably constitutional conditions," in combination, constitute cruel and unusual punishment. Additionally and more importantly, the Seventh Circuit has recently held that the totality of conditions at Marion does not violate the eighth amendment. In *Caldwell v. Miller*, plaintiff claimed that the conditions he challenged (restrictions on exercise, the ban on religious services, the suspension of contact visitation, and restrictions on use of the law library), when taken together, constituted cruel and unusual punishment. The court held:

> So considered, the total effect of the conditions Caldwell challenges neither result in an "unquestioned and serious deprivation of basic human needs," ... nor do they cause intolerable or shocking prison conditions. As we have noted, mere "inactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment."

*Caldwell*, 790 F.2d at 601 n. 16. And in *Miller v. Henman*, the court, citing *Caldwell*, expressly stated, "We have held that the lockdown does not violate the Constitution, including the due process clause of the fifth amendment." *Miller*, 804 F.2d at 422.

■ Plaintiffs contend, nevertheless, that the psychological effects of confinement at Marion have resulted in cruel and unusual punishment. The evidence before this Court indicates otherwise. Dr. William Logan, the director of law and psychiatry at the Meninger Foundation, and an expert witness in this case, conducted a study to determine the mental effects of confinement at Marion. The study began in June, 1985 and at the time of the December, 1986 hearings, Dr. Logan had spent approximately 400 hours interviewing inmates, compiling psychological test results,

and reviewing inmate files. A control group from Leavenworth was used in the study. Dr. Logan interviewed sixty-four inmates at Marion, with the interviews ranging from forty-five minutes to two and one-half hours. (The average interview lasted one hour and fifteen minutes.) Twenty-seven inmates from Leavenworth were interviewed. Although the study will not be complete until the spring of 1987 (Dr. Logan indicated that he still needed to review medical files at Leavenworth and to compile further statistics), the observations and findings of Dr. Logan thus far further indicate that the psychological effects of confinement at Marion do not rise to the level of cruel and unusual punishment. Although plaintiffs' experts testified otherwise, those experts spent considerably less time interviewing prisoners and compiling data.

Dr. Logan found no *uniform pattern* of psychological disorders and only a few cases of severe psychological disorders requiring hospitalization. He further found that there were different levels of anxiety at Marion, depending on an inmate's level of confinement. Interestingly, the lowest level of anxiety was found among the inmates in the Control Unit, while the highest level of anxiety was found among those prisoners confined in disciplinary segregation and protective custody. Dr. Logan testified that, based on these findings, he did not believe there was a direct correlation between the level of confinement and a prisoner's anxiety level. In other words, according to Dr. Logan, while the level of confinement might be one factor affecting an inmate's anxiety, it was clearly not the sole factor. In relation to these findings, Dr. Logan further testified that *in general,* the study indicated that the conditions of confinement at Marion will not lead to suicide, self-mutilation or hallucinations.

The Court is mindful that no permanent conclusions can be drawn from Dr. Logan's study, and that the exact effect of confinement at Marion has not been determined. His testimony, however, certainly supports a finding that the psychological effects of confinement at Marion do not constitute cruel and unusual punishment. Plaintiffs have failed to present sufficient evidence to prove otherwise. Therefore, based on the evidence in the record and in light of the Seventh Circuit's decision in *Caldwell v. Miller,* the Court finds that the totality of conditions at Marion does not violate the eighth amendment.

Accordingly, the Magistrate's Recommendation is hereby ADOPTED. Plaintiffs' Motion for Preliminary Relief Re Brutality, Motion for Preliminary Relief Re Conditions and Motion for a Permanent Injunction are hereby DENIED.

IT IS SO ORDERED.