**Steven RUSS, Plaintiff–Appellant,**

**v.**

**Warren YOUNG and Walter J. Dickey, Defendants–Appellees.**

**No. 88–3072.**

United States Court of Appeals, Seventh Circuit.

Submitted Oct. 24, 1989.[1]

Decided Dec. 18, 1989.[2]

Amended As An Opinion Feb. 20, 1990.

**1.** After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." *See* Fed.R. App.P. 34(a); Circuit Rule 34(f). No such statement having been filed, the appeal is submitted on the briefs and record.

**2.** This appeal was originally decided by unpublished order on December 18, 1989. *See* Circuit Rule 53. The Court, upon request, issues this decision as an *opinion.*

**1150**

Daniel W. Hildebrand, Ross & Stevens, Madison, Wis., for plaintiff-appellant.

Frank D. Remington, Asst. Atty. Gen., Office of the Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for defendants-appellees.

Before WOOD, Jr., COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Steven Russ, an inmate at the Waupun Correctional Institution in Waupun, Wisconsin, brought this action under 42 U.S.C. § 1983 alleging that the defendants, prison administrators, had violated his rights under the United States Constitution in transferring him to a temporary lockup (TLU) status in violation of the Wisconsin Administrative Code regulations dealing with prison operations. On consideration of Russ' motion for summary judgment, the district court found that the defendants named were entitled to a dismissal from the lawsuit and entered judgment accordingly. We affirm.

I.

The Wisconsin Administrative Code, § HSS 303.11(4)(b) permits prison employees to place a convict in temporary lockup if, among other reasons, it is more likely than not that "if the inmate remains in the general population, he or she will encourage other inmates by example, expressly, or by their presence, to defy staff authority and thereby erode staff's ability to control a particular situation." The next working day, the decision to confine the inmate in TLU is reviewed by the security director, who is required to consider any statements the inmate may wish to make in determining whether temporary lockup is still appropriate. Wis. Admin. Code § HSS 303.-11(2). The continued holding of the inmate in TLU is reviewed by the security director every seven days, and absent a special order by the superintendent of the institution, the maximum stay in TLU is 21 days. Wis.Admin.Code § HSS 330.11(3).

The facts of this case are not in dispute. Waupun Correctional Institution operates a drug-screening program for inmates requiring them to submit to random urinalysis tests. When a convict is selected, he is asked to provide a specimen for analysis. The inmates directed to provide samples on any particular day are taken to the prison's visiting room, where they are detained until they are requested to provide urine specimens. On May 23, 1985, Russ was ordered to submit a urine specimen and he refused. Although Russ did not react in a violent manner when he refused to give the urine sample, the officer in charge, Lieutenant Gozinske, placed Russ in temporary lockup pending a disciplinary hearing on a charge of failing to obey a direct order, and because Gozinske believed that if Russ were not removed from the visiting room, other inmates might refuse to follow orders to provide urine samples, thus undermining Gozinske's ability to control the program. On May 30, 1985, after a hearing before a prison disciplinary board, Russ was found guilty of failing to obey a direct order (refusing to give the urine sample as ordered) and was sentenced to four days in adjustment isolation and a maximum of 120 days of program segregation.

On June 28, 1985, Russ, while still in program segregation, was once more ordered to provide a urine sample, and was

advised that if he refused he would be moved from punitive program separation to non-punitive temporary lockup pending another disciplinary hearing. Again, he refused to produce the sample and was transferred to temporary lockup to await another hearing. Officer Gozinske prepared a report stating that he believed that if Russ were returned to the general population after his refusal to cooperate, it would encourage other inmates to refuse to comply with staff orders. While in TLU, Russ wrote to the administrator of the Division of Corrections, the defendant Dickey, in which he complained that the drug-testing program was being used to harass him and requested his immediate release. Dickey responded to the letter, but did not order Russ' release. Russ was held in TLU until his July 18, 1985, disciplinary hearing, where he was found guilty of disobeying orders and sentenced to five days of adjustment segregation.

On November 22, 1985, Russ was again ordered to submit a urine sample. Once more he refused and was taken to the TLU. The officer who ordered his confinement in TLU, Lieutenant Lackey, stated that the reason was the probable effect of Russ' refusal on the approximately 20 other inmates present, and the possible effect of his presence on their willingness to provide specimens when ordered to do so. Russ was given a disciplinary hearing on the charge of disobeying a direct order on December 6, 1985, and was sentenced to ten days' room confinement during nonwork hours.

On February 7, 1986, Russ was selected to submit a sample on a fourth occasion, and again he refused. Lieutenant Oestreich ordered that he be detained in temporary lockup status pending a full disciplinary hearing. That same day, Russ wrote to defendant Young, the superintendent of the Waupun Prison, asking that he be released. Young replied on February 12, 1986, defending the correctional officers' actions. At the disciplinary hearing on February 18, Russ was found guilty of disobeying a direct order by refusing to submit a urine sample and he was sentenced to six days' adjustment, 180 days' program separation and the loss of 10 days of good time.

Some six months later, on July 24, 1987, Russ again was ordered to submit a urine sample. Again he refused, in front of about 25 other inmates who likewise had been ordered to be tested. Again Russ was taken to TLU. Captain Torsella's "Notice of Inmate Placed in Temporary Lockup" cited Wisconsin Administrative Code § HSS 330.11(4)(b) for authority, based on the probable effect of Russ' refusal to cooperate upon the other inmates. Again, Russ wrote to Warden Young requesting immediate release, complaining that he was being singled out for harassment based on his continued refusals to submit to a urinalysis test. Young responded: "As you will be afforded a full due process hearing and I am the appealing authority if you are dissatisfied with the decision, I will make no further comment at this time." Another letter to Young, dated August 2, 1987, requested release from TLU pending the disciplinary hearing. On this occasion Young referred the matter to the security director. At the disciplinary hearing on August 13, 1987, Russ was found guilty of disobeying a direct order, and was sentenced to six days of adjustment isolation and 120 days of program segregation.

Judge Crabb, relying on the undisputed facts, granted summary judgment in favor of the defendants. Judge Crabb held that "so long as the [prison] officials can establish that they acted in the good faith belief that placing plaintiff in temporary lockup was necessary to prevent him from encouraging 'other inmates by example, expressly, or by their presence, to defy staff authority and thereby erode staff's ability to control a particular situation,' HSS 303.11(4), they were acting under the authority of the Wisconsin Administrative Code, and their placement decision cannot be characterized as so lacking in justification as to constitute punishment." Mem. op. at 16–17. Judge Crabb went on to hold that Russ had not presented any facts to raise a genuine issue as to the good faith of the officers and granted summary judgment for the defendants.

On appeal, Russ argues that it was error to grant summary judgment on the strength of the correctional officers' assertions of their subjective intent in assigning Russ to TLU. He also argues that the district court gave too much deference to the decisions of the correctional officials. On the other side, the defendants argue that Russ had no liberty interest in being kept out of temporary lockup, and that if Russ had any due process rights under the Constitution and the Wisconsin regulations, those rights were satisfied.

## II.

The thrust of Russ' argument is that he was placed in temporary lockup in violation of Wis. Admin. Code § HSS 303.11 which, according to Russ, creates a liberty interest cognizable under the due process clause of the fourteenth amendment in remaining out of temporary lockup based on arbitrary and punitive reasons. The fourteenth amendment prohibits the government from depriving "any person of life, liberty, or property, without due process of law." However, the types of "liberty" and "property" interests cognizable under the due process clause are not unlimited. To establish a deprivation of a constitutionally protected interest, an individual must demonstrate a "legitimate claim of entitlement" which has been interfered with by the state. *Kentucky Department of Corrections v. Thompson*, — U.S. —, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). The Supreme Court has recognized that protected liberty interests "may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983).

■ At the outset, we note that Russ does not contend in his brief that the due process clause, in and of itself, creates a liberty interest in remaining out of temporary lockup, nor could he successfully advance such a claim. Temporary lockup is, essentially, a change in the conditions of a prison inmate's confinement. The Supreme Court has repeatedly "rejected the notion 'that *any* change in the conditions of con-

finement having a substantial adverse impact on the prisoner involved is sufficient to involve the protections of the Due Process Clause.'" *Kentucky Department of Corrections*, 109 S.Ct. at 1908 (quoting *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976)) (emphasis in *Meachum*). "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). In this vein, this court has stated:

> "A state prison inmate has no liberty interest, originating in the Constitution of the United States, in remaining in a particular penitentiary.... The due process clause, in and of itself, does not 'protect a duly convicted prisoner against transfer from one institution to another within the state prison system.' ... Consequently, the Constitution does not mandate a nationwide rule requiring certain procedural formalities, such as a hearing, prior to such a transfer. This is true even in the case of disciplinary transfers: [ ] the due process clause, in and of itself, 'does not require hearings in connection with [intrastate interprison] transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive.'"

*Shango v. Jurich*, 681 F.2d 1091, 1098 (7th Cir.1982) (citations and footnote omitted). It follows that there is no constitutional right from the due process clause, in itself, to a particular placement within a single institution. *See Williams v. Faulkner*, 837 F.2d 304, 309 (7th Cir.1988) (prisoners have no liberty interest in remaining in a particular prison wing). *See also Hewitt*, 459 U.S. at 467–68, 103 S.Ct. at 869–70 (prisoners have no liberty interest in remaining in the general prison population arising from the due process clause in and of itself); *Meachum*, 427 U.S. at 225, 96 S.Ct. at 2538 (due process clause does not limit interpri-

son transfer even when the new institution is much more disagreeable).

Although Russ may not claim a liberty interest arising solely from the due process clause, it is well settled that "state statutes may create liberty interests that are entitled to the procedural protections of [the due process clause]." *Vitek v. Jones,* 445 U.S. 480, 487, 100 S.Ct. 1254, 1260, 63 L.Ed.2d 552 (1980); *Hewitt,* 459 U.S. at 469, 103 S.Ct. at 870. "The adoption of mere procedural guidelines, however, does not give rise to a liberty interest protected under the fourteenth amendment." *Culbert v. Young,* 834 F.2d 624, 628 (7th Cir. 1987), *cert. denied,* 485 U.S. 990, 108 S.Ct. 1296, 99 L.Ed.2d 506 (1988). To create a constitutionally protected liberty interest, a state must employ "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that [the challenged action] will not occur absent specific substantive predicates—viz. 'the need for control,' or 'the threat of a serious disturbance.'" *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871–72. In other words, a liberty interest is created only where the state regulation in question contains "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow...." *Kentucky Department of Corrections,* 109 S.Ct. at 1910. "The test for whether a statutory or regulatory procedure creates a protectable due process interest, then, hinges on the actual language used by the legislature or agency." *Cain v. Lane,* 857 F.2d 1139, 1144 (7th Cir.1988). "Absent some statutory or regulatory provision that clearly limits prison officials in the exercise of their discretion, a prisoner may be transferred for any reason, or for no reason at all." *Williams,* 837 F.2d at 309; *Shango,* 681 F.2d at 1100. *See also Olim v. Wakinekona,* 461 U.S. 238, 249–51, 103 S.Ct. 1741, 1747–49, 75 L.Ed.2d 813 (1983).

Our reading of the Wis. Admin. Code § HSS 303.11, convinces us that the regulation does not place such substantive limits on official discretion sufficient to es-tablish a prisoner's liberty interest in staying out of TLU. The regulation states:

"An inmate may be placed in TLU and kept there only if the decision maker is satisfied that it is more likely than not that one or more of the following is true:

(a) If the inmate remains in the general population, the inmate will seek to intimidate a witness in a pending investigation or disciplinary action;

(b) If the inmate remains in the general population, he or she will encourage other inmates by example, expressly, or by their presence, to defy staff authority and thereby erode staff's ability to control a particular situation;

(c) If the inmate remains in the general population, it will create a substantial danger to the physical safety of the inmate or another;

(d) If the inmate remains in the general population, it will create a substantial danger that the inmate will try to escape from the institution; or

(e) If the inmate remains in the general population, a disciplinary investigation will thereby be inhibited."

Wis. Admin. Code § HSS 303.11(4). Initially, we note that the language in the Wis. Admin. Code § HSS 303.11(4) states that "[a]n inmate *may* be placed in TLU ...," and thus, in context, merely provides procedural guidelines permitting, but not mandating, the placement of an inmate in TLU. Thus, the very language of the regulation employs discretionary rather than the "*unmistakably* mandatory" language required under *Hewitt* and does not rise to the level of creating a liberty interest protected under the United States Constitution. *See Cain,* 857 F.2d at 1144–45; *Mathews v. Fairman,* 779 F.2d 409, 414 (7th Cir.1985). *See also Kentucky Department of Corrections,* 109 S.Ct. at 1906 n. 1 (visitors may be excluded from visiting inmates if, *inter alia,* the visitor "would constitute a clear and probable danger to the institution's security or interfere with [its] orderly operation").

Moreover, the regulation allows removal from the general population if the charging officer subjectively believes that it is more

likely than not that any of the criteria set forth in § HSS 303.11(4) are met, regardless of whether in fact the criteria are actually met—the regulation does not make the inmate's remaining in the general prison population dependent on the prisoner's own good behavior. We do not agree that somehow the requirement that the officer be satisfied places a substantive limitation on his discretion. The convict does not have a substantive right requiring that the security officer ordering the confinement hold a particular subjective belief, as the regulation does not require that the decisionmakers' subjective beliefs be well founded in fact. Prison officials are not required to demonstrate that defiance of a lawful order (in this case, urine testing) will actually result in similar defiance by others if the offender is not removed from the general population. It is not required that the authorities demonstrate that other inmates were in fact induced to follow Russ' example and in fact refused to cooperate with the urine testing program— Russ had no right under the regulation to insist that the security officers be objectively reasonable in subjectively fearing such an event. Russ' "rights" were in no way dependent on the realities of the situation, but only upon the perceptions of the officers. Thus, Russ' placement in TLU depended, in large part, on the *judgment* of the particular officer assessing Russ' defiance. In *Miller v. Henman*, 804 F.2d 421, 427 (7th Cir.1986), this court held that a Bureau of Prisons directive charging the prison staff with using professional judgment, *albeit within specific guidelines*, did not create a liberty interest because the directive was intended to guide the prison officials rather than the inmates. The rationale of *Miller* is controlling here. Although § HSS 303.11 offers the prison officials guidelines as to when a prisoner might be placed in TLU confinement, those guidelines fall far short of creating a federal constitutional liberty interest. As we have stated in the past, "prison administrators must be 'accorded wide-ranging deference in the ... execution of policies and practices that *in their judgment* are needed to preserve internal order and discipline and to maintain institutional security.'" *Mathews*, 779 F.2d at 415 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)) (emphasis added).

Finally, we note that the regulation's provisions for the prison security director's review of an inmate's initial placement in TLU do not alter our conclusion that no liberty interest arises under § HSS 303.11. The security director's review, like that of the official initially placing the inmate in TLU, is subjective. In any event, it is well settled that a careful state procedural structure to regulate the exercise of official discretion, standing alone, does not establish the existence of a protected liberty interest. *Culbert*, 834 F.2d at 628 (citing *Hewitt*, 459 U.S. at 469–70, 103 S.Ct. at 870–71). *See also Shango*, 681 F.2d at 1100 ("The argument that the procedures established by the regulations can themselves be considered a liberty interest is analytically indefensible.").

Accordingly, we hold that the prisoner has no right to determine his location within the confines of the prison. His assignment to a particular area is dependent only on the subjective decision of the security officers, and therefore no federal liberty interest cognizable under the fourteenth amendment is created by the Wisconsin regulation. Because neither the United States Constitution, in and of itself, nor Wisconsin Administrative Code § HSS 303.-11(4), being permissive in nature, create a protectable liberty interest in remaining in the general prison population, Russ' being removed from that population cannot constitute a federal unconstitutional deprivation without due process of law. The judgment of the district court is AFFIRMED.