Maurice SMITH and Sidney Jackson, Plaintiffs–Appellants,

v.

John T. SHETTLE, Jack R. Duckworth, and David Bonner, Defendants– Appellees.

No. 90–3099.

United States Court of Appeals, Seventh Circuit.

Argued June 19, 1991.

Decided Oct. 24, 1991.

Donald W. Pagos (argued), Sweeney, Dabagia, Donaghue & Thorne, Michigan City, Ind., for plaintiffs-appellants.

Kermit R. Hilles, Deputy Atty. Gen., John M. White (argued), Office of the Atty. Gen., Federal Litigation, Indianapolis, Ind., for defendants-appellees.

Before CUMMINGS, POSNER, and COFFEY, Circuit Judges.

POSNER, Circuit Judge.

In 1988 two inmates of an Indiana state prison filed this suit under 42 U.S.C. § 1983, seeking damages and other relief for being confined in administrative segregation at the prison. "Segregation" in this context means being separated from the general prison population and held in an approximation to solitary confinement. It can be imposed either as a form of discipline for infractions of prison regulations ("disciplinary segregation") or, as here, for protective purposes ("administrative segregation"). One of the two inmates in question had been placed in administrative segregation upon his arrival at the prison, the ground being both his disruptive behavior when previously confined there and the fact that he had been in administrative segregation in the prison from which he was transferred. The other inmate was placed in administrative segregation after his arrival; the ground was also disruptive behavior but the particulars are not in the district court record. When the suit was dismissed on the defendants' motion for summary judgment, the plaintiffs had been in administrative segregation for 15 months and for two years, respectively.

The district court's ground for dismissing the suit was that inmates do not have a "liberty interest" in not being

placed in administrative segregation. The due process clause of the Fourteenth Amendment, which is the source of the federal rights that the plaintiffs seek to enforce by means of this suit, forbids a state to deprive a person of life, liberty, or property without due process of law. The state does not—not yet, anyway—create life, or the form of natural liberty that consists of being able to move about freely under one's own power. It is however the source of property rights, and of the rights if any that persons lawfully confined in state prisons have to enjoy a modicum of freedom of locomotion within the prison walls. Subject only to such restraints as the cruel and unusual punishments clause of the Eighth Amendment may place upon the severity of punishment, a state can confine a prisoner as closely as it wants, in solitary confinement if it wants; a prisoner has no natural liberty to mingle with the general prison population. (He may have other natural liberties, such as liberty from confinement in a mental hospital. *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980).) Only if the state decides to recognize such a liberty—a liberty that is artificial, therefore, rather than natural—does he have a right that he can enforce under the due process clause of the Fourteenth Amendment. *Hewitt v. Helms*, 459 U.S. 460, 470–72, 103 S.Ct. 864, 870–72, 74 L.Ed.2d 675 (1983); *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460–61, 109 S.Ct. 1904, 1908–09, 104 L.Ed.2d 506 (1989).

■ So we must decide whether the State of Indiana has conferred on its inmates an entitlement not to be placed in administrative segregation. It has if it has set forth a list of criteria to govern such placement that are (1) *binding*, that is, mandatory upon the officials to whom they are addressed, *Miller v. Henman*, 804 F.2d 421 (7th Cir.1986); (2) *exhaustive*, in the sense that if none of the criteria is satisfied the prison officials are forbidden to segregate the inmate, *Kentucky Dept. of Corrections v. Thompson, supra*, 490 U.S. at 462, 109 S.Ct. at 1909; *Wallace v. Robinson*, 940 F.2d 243, 246–47 (7th Cir.1991) (en banc); and (3) *definite*, in the sense that none of the criteria is so open-ended that it leaves the officials with essentially limitless discretion to segregate the inmate or not as they please. *Kentucky Dept. of Corrections v. Thompson, supra*, 490 U.S. at 463, 109 S.Ct. at 1910. If the list is open-ended—the criteria in it merely illustrative and the officials free to segregate the inmate for a reason that does not appear on the list, or perhaps for no reason at all—or if any of the criteria on the list are open-ended in the same sense, albeit the list itself is closed, or if the criteria are merely for the guidance of the officials and leave them free to depart, the inmate does not have a liberty that he can enforce under the Fourteenth Amendment. *Id.* at 464, 109 S.Ct. at 1910; *Miller v. Henman, supra*.

■ Does Indiana law create such a liberty? An Indiana statute permits administrative segregation if the prison "first finds that segregation is necessary for the offender's own physical safety or the physical safety of others." Ind.Code § 11–10–1–7(a). Were this the only source of authority to segregate inmates, they would have a liberty interest: the statute sets forth a closed list of criteria (two in number) one of which must be satisfied for segregation to be lawful; and the criteria establish a definite, administrable standard rather than leaving decision to the discretion of the prison officials. Reading such a statute a prisoner could reasonably say to himself, "I am *entitled* to remain in the general prison population unless my own safety or that of others would be endangered by my remaining there."

■ It makes no difference that the Indiana statute does not use "mandatory" language, such as "shall" or "must." It is true that a number of cases describe "mandatory language" as a hallmark of a liberty-creating statute. The most explicit and authoritative of these statements appear in the Supreme Court's decision in *Kentucky Dept. of Corrections v. Thompson, supra*, 490 U.S. at 463, 109 S.Ct. at 1910. These dicta have given rise to two suggestions: that a statute which does not contain such

words cannot create a liberty interest, *Cain v. Lane,* 857 F.2d 1139, 1144 (7th Cir.1988); *Russ v. Young,* 895 F.2d 1149, 1153 (7th Cir.1990); *Castaneda v. Henman,* 914 F.2d 981, 983 (7th Cir.1990), and that a statute which permits but does not require administrative segregation or some other deprivation is insufficiently "mandatory" to create such an interest. *Russ v. Young, supra,* 895 F.2d at 1153–54. We are skeptical about placing so much weight on grammatical distinctions, such as those between the imperative and declarative moods. If a statute says, "only if one of the following grounds is established does the prison have authority to segregate an inmate," it means the same as if it said, "any of the following grounds shall authorize the segregation of an inmate," even though it contains no "mandatory" words.

It also makes no difference either that the statute does not *require* but only permits segregation—most statutes leave discretion to the persons charged with their enforcement rather than commanding them to enforce the statute to the hilt—this is the famous "prosecutorial discretion"—or that the statute does not itself create procedures for determining whether one of the specified grounds has been established in a particular case. The Constitution itself prescribes the minimum procedural requirements—the process that is due. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985). The only thing the state law must do is create an entitlement.

We must not be mesmerized by judicial language taken out of context and hardened into formula. That "explicitly mandatory language" in the sense of words that are in the imperative mood as a matter of grammar is not a sine qua non of entitlement should be plain from *Kentucky Dept. of Corrections* itself, for there the Supreme Court defined "explicitly mandatory language" to mean "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow," and gave as an example of such a directive "administrative segregation will not occur absent specified substantive predicates." 490 U.S. at 463, 109 S.Ct. at 1910. "Will" (simple future tense, except when used with the first person, i.e., either "I" or "we"), not "shall" (imperative when used with second or third person—"Thou shalt not kill"). And later, explaining why the regulations at issue "lack the requisite relevant mandatory language," the Court pointed out that they "stop short of requiring that a particular result is to be reached upon a finding that the substantive predicates are met." *Id.* No magic form of words is required to make a regulation mandatory; all that is required is that it be clear that if X (the substantive predicate), then Y (the specified outcome, from which the enforcement officials are not free to depart). *Wallace v. Robinson, supra,* 940 F.2d at 246.

Analysis is complicated here by the fact that the provision that we quoted from the Indiana Code does not stand alone. An administrative regulation (Indiana State Prison Standard Operating Procedure No. 108, April 18, 1983), the validity of which the plaintiffs do not challenge, provides for assignment to segregation "based upon determination of one or more of the following: 1) the continued presence of the inmate in general population poses a serious threat to himself, other inmates, staff or property, or 2) the inmate's behavior is a serious threat to the security and/or orderly operation of the institution." This is again a closed-end list; unless one of the two criteria (more than two when all the "or's" are counted) is satisfied, the prison officials are not authorized to segregate an inmate. The list in the regulation differs from the statutory list, so far as material to our analysis, chiefly in that the last criterion—"the inmate's behavior is a serious threat to the ... orderly operation of the institution"—might be thought too open-ended to confer an entitlement. The terms "behavior," "serious," "threat," and "institution" are clear enough, but what are we to make of "orderly operation"? The "security" of the institution is covered in a separate clause, so presumably "orderly operation" is intended to reach beyond mere security. Might this mean that the

prison officials could segregate an inmate because they thought that his behavior, while not menacing, was sufficiently unruly to interfere with the rehabilitation of the other prisoners? Maybe so, and if so, this is probably too vague to be enforceable as a Fourteenth Amendment right.

But this we need not decide, since the defendants' uncontradicted affidavits show that these inmates received all the process due them. The barebones constituents of fair procedure and therefore of due process are (besides jurisdiction) notice and an opportunity to be heard, *Twining v. New Jersey,* 211 U.S. 78, 110–11, 29 S.Ct. 14, 24–25, 53 L.Ed. 97 (1908), and the plaintiffs received both. In the case of administrative segregation, it is true, there may be an additional constituent of due process, and that is periodic or at least occasional review of the inmate's status. Administrative segregation differs from punishment in that it has no definite limit of time. Like imprisonment for civil contempt, its duration is tied to the duration of the condition that warranted its imposition. That condition may change at any time. If an inmate is placed in administrative segregation because he has been threatened by another inmate, the release of the second inmate is an occasion to reexamine the segregation of the first inmate. The Indiana statute and regulations governing administrative segregation require that the inmate's status be reviewed every thirty days, and the inmates argue that this wasn't done for them. The defendants deny this, and in the district court they backed up their denials with affidavits, which not being contradicted bound the district court. Fed.R.Civ.P. 56(e); *Hunafa v. Murphy,* 907 F.2d 46, 48 (7th Cir.1990); *Fuller v. CBT Corp.,* 905 F.2d 1055, 1058 (7th Cir.1990). The plaintiffs do not argue that even more frequent reviews are constitutionally required. They do argue that the reviews are constitutionally inadequate because the inmate is not always allowed to be present in person, but we do not think that due process requires the inmate's personal presence unless he can show that his presence is important to the review process, and this neither inmate in this case has attempted to show.

On the contrary, the record shows that the plaintiffs several times refused to meet with the monthly review team, though offered a chance to do so.

We add that the mere fact that Indiana law requires review every thirty days does not establish this frequency as a constitutional minimum (or maximum). Procedural regulations are not a source of constitutional entitlements, *Olim v. Wakinekona,* 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983); *Shango v. Jurich,* 681 F.2d 1091, 1100 (7th Cir.1982); *Woods v. Thieret,* 903 F.2d 1080, 1082 (7th Cir.1990); *Kellas v. Lane,* 923 F.2d 492, 494 (7th Cir.1990), and violations of a state law that does not create such an entitlement are not actionable under the due process clause. *Archie v. City of Racine,* 847 F.2d 1211, 1216–17 (7th Cir.1988) (en banc). To repeat, the amount of due process that is due is defined by federal rather than by state law—for otherwise a state could not give its inmates more procedure than the Constitution entitled them to, and what sense would such a rule make? So these inmates will not be heard to argue in federal court that less frequent review of their segregated status than state law required ipso facto violated their constitutional rights. The question rather is what federal standards of due process require.

We think they require *some* ongoing review of the status of inmates placed in administrative segregation—always assuming that they claim an *entitlement* not to be in segregation. This is an important qualification. It distinguishes cases such as *Miller v. Henman, supra,* which hold that no hearing is required before a prisoner may be transferred to a maximum-security prison (administrative segregation writ large), because prison authorities reserve to themselves discretion to move a prisoner around within a prison system. This case is different because Indiana has (we are assuming) set forth criteria that limit the discretion of its prison officials to place inmates in administrative segregation. And because these criteria can change through time, some ongoing review is nec-

essary in order to determine whether they are still being met. This would not be necessary if the period of administrative segregation were fixed in advance on the basis of an estimate of future conditions. But it is not; it is an indefinite term, keyed to changing conditions, so there has to be some mechanism for determining whether change has occurred.

To conclude, however, that the due process clause fixes thirty days as the minimum frequency of the required review would be to legislate in the name of the Constitution at an excessive level of detail, even if these inmates have a constitutional entitlement to return to the general prison population unless deprived of that entitlement in accordance with the requirements of due process of law. The judgment dismissing their suit is therefore

AFFIRMED.

COFFEY, Circuit Judge, concurring.

I disagree with the majority's dictum that if Indiana Code § 11–10–1–7(a) were "the only source of authority to segregate inmates, they would have a liberty interest...." Maj.Op. at 1252.[1] Indiana Code § 11–10–1–7(a) states that "[a]n offender may be involuntarily segregated from the general population of a facility or program if the department first finds that segregation is necessary for the offender's own physical safety or the physical safety of others." I would rule that this language fails to create a protected liberty interest, as it does not provide specific direction to the decisionmaker that if certain substantive predicates exist, a specified outcome must follow; in short, the statute does not contain the "explicit mandatory language" the Supreme Court deems necessary to create a liberty interest.

The Supreme Court has clearly stated the prerequisites for finding a state-created liberty interest:

"We have also articulated a requirement, implicit in our earlier decisions, that the regulations contain 'explicitly mandatory language,' i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest. See Hewitt v. Helms, 459 U.S. [460,] 471–472, 103 S.Ct. [864,] 871–72.... In sum, the use of 'explicitly mandatory language,' in connection with the establishment of 'specific substantive predicates' to limit discretion, forces a conclusion that the State has created a liberty interest. Hewitt v. Helms, 459 U.S., at 472, 103 S.Ct., at 871."

Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989). The majority disdains the requirement of "explicitly mandatory language," describing it as dicta, and criticizes prior decisions of this Court that applied the Supreme Court's criteria. See Maj.Op. at 1252–53. The majority admonishes that "[w]e must not be mesmerized by judicial language taken out of context and hardened into formula." It then misinterprets Thompson, thus undermining the Supreme Court's emphasis on "explicitly mandatory language": "the Supreme Court defined 'explicitly mandatory language' to mean 'specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow,' and gave as an example of such a directive 'administrative segregation will not occur absent specified substantive predicates.'" Maj.Op. at 1253. The majority, for obvious reasons, quotes only a part of the sentence (and thus only a portion of the reasoning), which states: "The regulations at issue in Hewitt mandated that certain procedures be followed, and 'that administrative segregation will not occur absent specified substantive predicates.'" Thompson, 109 S.Ct. at 1910 (quoting Hewitt v. Helms, 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983)) (emphasis added). Furthermore, the language quoted from Hewitt, read in context, makes clear that it was the mandatory nature of the procedures set forth in the Pennsylvania statutes and regulations

---

1. Since Indiana Code § 11–10–1–7(a) is not "the only source of authority to segregate inmates," the majority's entire discussion of it appears to be dictum.

*in combination with the substantive predicates* that created the liberty interest:

> "[I]n this case [Pennsylvania] has gone beyond simple procedural guidelines. It has used language of an unmistakably mandatory character, requiring that *certain procedures* 'shall,' 'will,' or 'must' be employed, see n. 6 *supra,* and that administrative segregation will not occur absent specified substantive predicates—vis., 'the need for control,' or 'the threat of a serious disturbance.' Petitioners argue, with considerable force, that these terms must be read in light of the fact that the decision whether to confine an inmate to administrative segregation is largely predictive, and therefore that it is not likely that the State meant to create binding requirements. But on balance we are persuaded that the repeated use of explicitly mandatory language *in connection with* requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest."

*Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983) (emphasis added). Thus, it is evident that the liberty interest in *Hewitt* emanated from the "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed" combined with the factor "that administrative segregation will not occur absent specified substantive predicates" rather than merely from the substantive predicates.[2] If substantive predicates without a specified outcome constituted "explicitly mandatory language," as the majority states, all that is necessary to create a protected liberty interest in a similar factual situation is specific substantive predicates that are (1) binding,[3] (2) exhaustive, and (3) definite, as the majority posits. *See* Maj.Op. at 1252. But it is clear that the Supreme Court requires more: "In sum, the use of 'explicitly mandatory language,' *in connection*

*with* the establishment of 'specific substantive predicates' to limit discretion, forces a conclusion that the State has created a liberty interest." *Thompson,* 109 S.Ct. at 1910 (emphasis added).

Indiana Code § 11–10–1–7 clearly contains "specific substantive predicates" to guide the decisionmaker as to whether an inmate should be placed in administrative segregation: "An offender may be involuntarily segregated from the general population of a facility or program if the department first finds that segregation is necessary for the offender's own physical safety or the physical safety of others." Ind.Code 11–10–1–7(a). The substantive predicates are (1) "the offender's own physical safety" and (2) "the physical safety of others." But as in *Thompson,* the statute "lack[s] the requisite relevant mandatory language." *Thompson,* 109 S.Ct. at 1910. Contrary to the assertion of the majority (*see* Maj.Op. at 1252–53), it certainly does make a difference that the Indiana statute fails to use "explicitly mandatory language." As the Supreme Court noted in *Thompson,* "our method of inquiry in these cases always has been to examine closely the language of the relevant statutes and regulations." *Id.* at 1909. While the majority has found a protected liberty interest in *im*plicit language, the Supreme Court has clearly "articulated a requirement ... that the regulations contain '*ex*plicitly mandatory language.'" *Id.* at 1910 (emphasis added). As well-established precedent in this Court demonstrates, placing a protected liberty interest in "grammatical categories," such as the "explicitly mandatory language" the Supreme Court requires, enables a court to determine with confidence whether a protected liberty interest has been created. *See Castaneda v. Henman,* 914 F.2d 981, 983 (7th Cir.1990); *Russ v. Young,* 895 F.2d 1149, 1153 (7th Cir.1990); *Cain v. Lane,* 857 F.2d 1139, 1144 (7th Cir.1988); *see also Wallace v. Robinson,*

---

**2.** Mandatory procedures standing alone are likewise inadequate to create a protected liberty interest. *See Hewitt,* 459 U.S. at 471, 103 S.Ct. at 871; *Olim v. Wakinekona,* 461 U.S. 238, 248–51, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983).

**3.** The fact that a statute is binding, and failure to follow it is a violation of state law, fails to create a liberty interest: "Violations of state law do not automatically offend against the Constitution too." *Wallace v. Robinson,* 940 F.2d 243, 248 (7th Cir.1991).

940 F.2d at 246–47. By finding a protected liberty interest through implied language, the majority introduces confusion into the analysis that can only serve to create chaos and uncertainty in our respective courts and legislative bodies as to when and under what circumstances state statutes and regulations have created such interests.

The majority adds further disorder to the question of a creation of protected liberty interests through quoting the Supreme Court's definition of "explicitly mandatory language"—"specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow"—and even stating a formula consistent with that definition: "if X (the substantive predicate), then Y (the specified outcome, *from which the enforcement officials are not free to depart*)." Maj.Op. at 1253 (emphasis added). But the majority states that "[i]t ... makes no difference ... that the statute does not *require* but only permits segregation...." Maj.Op. at 1252–53 (emphasis original). If a statute is mandatory when it "does not *require* but only permits segregation," how can it also comply with the Supreme Court mandated "specified outcome, from which the enforcement officials are not free to depart"? The majority's latter statement follows the Supreme Court's directive that "if the regulations' substantive predicates are present, a particular outcome must follow, *in order to create a liberty interest.*" *Thompson,* 109 S.Ct. at 1910 (emphasis added). For reasons unknown the majority has failed to accept the Supreme Court's standard, for Indiana Code § 11–10–1–7 fails to mandate a particular outcome from the substantive predicates. The statute does *allow* prison authorities to involuntarily segregate an inmate—"[a]n offender *may be* involuntarily segregated"—but it falls short of meeting the Supreme Court's requirement in *Thompson* that "a particular outcome must follow" if officials believe "that segregation is necessary for the offender's own physical safety or the physical safety of others."[4] I disagree with the majority's statement that "[i]t ... makes no difference ... that the statute does not *require* but only permits segregation—most statutes leave discretion to the persons charged with its enforcement rather than commanding them to enforce the statute to the hilt...." Maj.Op. at 1252–53 (emphasis original). I do agree that "most statutes leave discretion to the persons charged with ... enforcement," and that is the precise problem with the majority's opinion—*most statutes do not create protected liberty interests.* But the majority's approach would open Pandora's box and create a flood of litigation to make it easier for the social engineers of the prison system to manipulate our penal system through making it possible to find a protected liberty interest in any statute that contains substantive predicates (without a mandatory outcome) that guide decisionmakers in their administration of prison life. It is particularly inappropriate to expand the protected liberty interest doctrine to statutes that not only provide prison officials discretion in whether to act, but *allow the prison authorities to exercise that discretion on the basis of their subjective beliefs.* In Indiana, it is immaterial whether conditions exist to make segregation necessary, for the Indiana administrative segregation statute is without objective criteria for the determination thereof; prison officials need only believe, in their

---

**4.** I recognize that in *Vitek v. Jones,* 445 U.S. 480, 487–91, 100 S.Ct. 1254, 1260–62, 63 L.Ed.2d 552 (1980), the Supreme Court found a protected liberty interest in a statute that merely allowed (without a mandate) prison authorities to transfer an inmate to a mental hospital if a designated physician found that the prisoner was suffering from a mental disease or defect that could not be treated properly in prison. It is significant that the Court also found that such a transfer, even without a statute allowing it, required due process. Since subsequent cases have focused on mandatory language and a specified outcome, I question whether the Court would find a protected liberty interest in a similar statute involving a lesser curtailment of liberty. Thus, while *Thompson* does not state that it is overruling *Vitek, Vitek* fails to negate the requirement more recently stated in *Thompson* that in order to create a protected liberty interest, a statue must dictate that "a particular outcome must follow." *Thompson,* 109 S.Ct. at 1910.

subjective opinion, that conditions exist in which the prisoner's physical safety or that of others is at risk.

I agree that the judgment of the district court dismissing the plaintiff's suit should be affirmed, but I am convinced that it is unnecessary to journey into that wide abyss of due process law through judicially creating a liberty interest of this type out of whole cloth. As the Supreme Court has noted,

> "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' We further observe that, on occasion, prison administrators may be 'experts' only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, *not the Judicial.*"

*Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979) (citations and footnote omitted) (emphasis added); *see also Palmer v. City of Chicago,* 755 F.2d 560, 578 (7th Cir.1985) (federal courts should defer to the Executive Branch). While we are dealing with a statute here rather than prison regulations, as in *Wolfish,* we must not lose sight of the fact that the Supreme Court has revealed its reasoning in clear and unambiguous language that federal courts should defer to the judgment of the legislative bodies and

prison authorities who are responsible for the day-to-day administration of prison facilities in most cases. Since the Indiana statute does not include the "explicitly mandatory language" the Supreme Court required in both *Hewitt v. Helms* and *Kentucky Dept. of Corrections v. Thompson,* I would affirm the district court and hold that Indiana Code § 11–10–1–7 does not create a liberty interest.