**Michael R. ZUNKER, Plaintiff,**

v.

**Daniel BERTRAND, Defendant.**

**No. 91–C–898.**

United States District Court,
E.D. Wisconsin.

July 6, 1992.

Michael R. Zunker, pro se.

Robert M. Hunter, Asst. Atty. Gen., State of Wis., Dept. of Justice, Madison, Wis., for defendant.

## ORDER

STADTMUELLER, District Judge.

Plaintiff, proceeding *pro se,* originally filed this complaint in the United States District Court for the Western District of Wisconsin seeking monetary relief from defendants Daniel Bertrand and Donald Clusen pursuant to 42 U.S.C. § 1983.[1] Thereafter, plaintiff filed an amended § 1983 complaint in which he only named Daniel Bertrand as defendant, dropping his claims against Donald Clusen. Next, plaintiff requested and was granted transfer of venue to this district. Plaintiff, while confined at the Green Bay Correctional Institute in Green Bay, Wisconsin,[2] contends that defendant's policy regarding pre- and post-visitation visual body cavity searches, and the manner in which the searches were conducted, violated plaintiff's Fourth and Fourteenth Amendment rights.

Defendant moved for dismissal of the complaint on grounds that plaintiff failed to state a claim upon which relief may be granted. Plaintiff, in opposition to defendant's motion, and defendant in response thereto, have referred to documents outside the amended complaint filed herein. Accordingly, Rule 12(b)(6), Fed.R.Civ.P., dictates that the motion to dismiss now be treated as a motion for summary judgment. Defendant asserts that the policy he instituted did not violate plaintiff's constitutional rights. In the alternative, defendant attempts to invoke the doctrine of qualified immunity, contending that he did not violate any of plaintiff's clearly established rights.

## I. Background

Plaintiff was an inmate confined to the Green Bay Correctional Institution (GBCI) and defendant was the associate warden and security director at GBCI at all times relevant to this complaint. Defendant Bertrand was responsible for the overall security operation of the institution, for the safe custody of inmates, and for the administration of policies and rules for the protection of the public, staff, and inmates.

In early May 1991, defendant received information that money and drugs were being brought into the institution during visitation, and he ordered cell searches. Money was found as a result of the cell searches and defendant decided that the security aspect of contact visits needed to be strengthened for a period of time.

On May 16, 1991, defendant directed a memorandum to all staff in which he ordered a strip search of all inmates leaving the visiting area. The memorandum was enacted pursuant to defendant's responsibility as security director and pursuant to Wis.Admin.Code § DOC 306.16(3)(c) and stated:

> Security Supervisors will ensure that all inmates coming from the Visiting Area are strip searched. The Visiting Extra, Rotunda and Cell Hall Officers are available to be used for this purpose.

Prior to May 16, 1991, staff at GBCI conducted strip searches periodically or as directed.

The rotunda, cell hall and visiting extra officers were to be available to conduct the strip searches in the booths of the shake down room, which is a room separate from the visiting area. The visiting room at GBCI consists of twenty-five visiting tables, snack, coffee and soda machines, a playhouse, the officer's desk, and a worker's desk. Across from visiting tables three through six are three separate rooms, A, B, and C; across from visiting tables

---

1. Plaintiff originally requested declaratory and injunctive relief in addition to monetary relief. Because the problem he complained of has since been alleviated, plaintiff concedes that his claim for declaratory and injunctive relief is now moot.

2. On December 31, 1991, the court received correspondence from plaintiff indicating that he had been transferred from Green Bay to a minimum security camp in Waupan, Wisconsin.

one and two is the shake down room which is where strip searches are conducted before or after visits or both.

Prior to visits, inmates enter the shake down room through gate forty-five, which is a steel door with a window approximately five feet from the bottom of the door and measuring nine and one-half inches by nine and one-half inches. From the shake down room, inmates enter the visiting room through gate forty-six, which is a steel door with a window approximately five feet from the bottom of the door and measuring nine and one-half inches by nine and one-half inches. Visitors enter and leave the visiting room through gate thirty-five, which is a grilled gate covered by plexiglass, separating the visiting room and lobby.

Gates forty-five and forty-six are locked during visits. The shake down room consists of five individual booths that are located on the west wall of the shake down room. Generally, the inmate is in the booth during the strip search; the officer conducting the strip search stands in front of the inmate.

Usually, visitors leave the visiting area before the strip searches are conducted on inmates in the booths of the shake down room. If a visit is terminated before the end of the visiting time, the visitor leaves the visiting room and an officer unlocks the door to the shake down room to allow the inmate to enter.

On May 28, 1991 defendant issued a memorandum regarding strip searches after visits. The memorandum stated:

The following procedures must be followed when conducting strip searches from the Visiting Area.

1. After the inmates are secured the visitors will be let out.
2. If there are more inmates than booths then the extra inmates will be placed back in the Visiting Area.
3. Search the inmates by groups, if needed.

After they are searched send them down, then search the next group, etc. until finished.

Remember this procedure is to be conducted with as much professionalism as possible.

Ronald Pederson was employed as a rotunda officer at GBCI from June 1, 1985 until July 28, 1991. As a rotunda officer, Pederson controlled all of the movement within the institution. His duties included conducting strip searches before and after visits. He never had any problem with visitors attempting to view inmates who were being strip searched or being able to view inmates while they were searched.

Gary Coenen has been employed as a utility officer at GBCI since January 1989. As a utility officer, he is assigned to positions as needed within the institution, including the position of rotunda officer. He is available to conduct strip searches as directed, and he has conducted strip searches on inmates who had contact visits. An inmate complained to Coenen about the lack of privacy in the strip search booths because there were no curtains over the booths. On June 16, 1991, Coenen wrote an informational incident report concerning this matter. Defendant received the report on the same day.

Captain Almstedt has been employed as captain at GBCI since 1985. He supervises forty-three officers and assigns officers to their posts. Between May 16 and June 17, 1991, Almstedt had occasion to supervise strip searches in the shake down room and he determined that the officers were in compliance with the institution's strip search procedure. On June 17, 1991, Almstedt recommended to defendant the addition of curtains to the booths in the shake down room to improve privacy and the enlargement of the booths to accommodate one officer to one inmate.

Due to the limited number of guards available for searching inmates and the varying number of prisoners to be searched at any given time, defendant had determined at the time he instituted the strip search policy that the use of privacy curtains would be impractical because the curtains would impede the officer's view of the inmate being searched and also allow inmates to hide contraband. He believed

that the booths in the shake down room provided privacy because the officer stood in front of the inmate during the strip search and obstructed the view of inmates waiting to be searched.

On June 18, 1991, curtains were installed on the booths in the shake down room and the strip search policy was modified to give the shift supervisor discretion in determining which inmates to strip search after visits.

Coenen has not received any complaints about lack of privacy in the strip search booths since the privacy curtains have been installed. Defendant asserts that from May 16, 1991, the date the strip search policy was instituted, until June 18, 1991 visitors in the visiting room were not allowed to view inmates being strip searched. Moreover, visitors have not been allowed to view inmates since privacy curtains were installed. Plaintiff, with supporting affidavits, disputes defendant's assertion that inmates were not allowed to view other inmates being strip searched between May 16, 1991 and June 18, 1991.

## II. Summary Judgment Standard

Summary judgment is appropriate whenever the "pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A material fact is one that might affect the outcome of the case under applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A factual dispute exists if there is sufficient evidence for a jury to return a verdict in favor of the nonmoving party. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510.

The moving party has the initial burden of showing that no material facts are in dispute. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). This burden can be met by " 'showing,'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving

party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). To defeat a properly supported motion the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; Rule 56(e). The parties cannot rest on mere allegations in the pleadings, *Koclanakis v. Merrimack Mut. Fire Ins. Co.,* 899 F.2d 673, 675 (7th Cir.1990), or upon general or conclusory factual allegations in affidavits, *Mestayer v. Wisconsin Physicians Service Ins. Corp.,* 905 F.2d 1077, 1079 (7th Cir.1990). Furthermore, the opposing party must show that a specific and material factual issue exists that must be decided at trial. *See Valentine v. Joliet Township High School District,* 802 F.2d 981, 986 (7th Cir.1986).

The court must then examine the evidence in the light most favorable to the nonmoving party, giving that party the benefit of every reasonable inference that can be drawn from those facts. *Smart v. State Farm Insurance Co.,* 868 F.2d 929, 931 (7th Cir.1989). The court's role is not to weigh the evidence but to determine whether there is a need for a trial—in other words, whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510; *McGraw–Edison Co. v. Walt Disney Prods.,* 787 F.2d 1163, 1167 (7th Cir.1986).

## III. Discussion

### A. *Fourth Amendment*

In the present case, defendant, as the moving party, has the initial burden of showing that there is no genuine issue of material fact. Defendant contends that plaintiff's constitutional rights were not violated by his strip search policy and that even if they were, defendant is entitled to qualified immunity because the law was not clearly established in May 1991 that the manner in which the searches were conducted at GBCI was impermissible. *See*

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (government officials performing discretionary functions generally shielded from liability for civil damages where their conduct does not violate clearly established rights of which a reasonable person would have known).

Plaintiff's first claim is that his Fourth Amendment constitutional right had been violated. The Fourth Amendment guarantees "[t]he right of the people to be secure ... against unreasonable searches and seizures." This right extends to incarcerated prisoners; however, the reasonableness of a particular search is determined by reference to the prison context. *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). In determining whether a search is reasonable, there must be a "balancing of the need for the particular search against the invasion of personal rights that the search entails." *Id.* at 559, 99 S.Ct. at 1884. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

Visual body cavity searches conducted after contact visits as a means of preventing inmates' possession of weapons and contraband, even absent probable cause, have been found reasonable by the Supreme Court. *Id.* at 558–60, 99 S.Ct. at 1884–85. In *Wolfish,* the Court recognized the danger to prison security that can result when contraband is smuggled into an institution, commenting that evidence of only one instance of an attempt to smuggle contraband "may be more a testament to the effectiveness of [a] search technique than to any lack of interest on the part of the inmates to [smuggle contraband]." *Id.* at 559, 99 S.Ct. at 1884. The Seventh Circuit Court of Appeals has condoned visual body cavity searches of inmates before and after their use of the library. *Campbell v. Miller,* 787 F.2d 217 (7th Cir.1986). Although in *Campbell* the court recognized the intrusiveness of such a search, it concluded that prison authorities had reason to

fear that contraband would be smuggled into and out of the library. *Id.* at 228. Similarly, the Ninth Circuit Court of Appeals has held that "so long as a prisoner is presented with an opportunity to obtain contraband or a weapon while outside of his cell, a visual strip search has a legitimate penological purpose." *Michenfelder v. Sumner,* 860 F.2d 328, 333 (9th Cir.1988) (citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *see also Rickman v. Avaniti,* 854 F.2d 327 (9th Cir.1988)) (upholding visual body cavity searches of all segregation unit inmates leaving their cells); *Hay v. Waldron,* 834 F.2d 481, 486 (5th Cir.1987) (upholding strip searches of inmates in segregation).

Therefore, the constitutionality of visual body cavity searches conducted pursuant to security concerns has been established. Since defendant initiated these searches after finding contraband in an inmate's cell, the searches themselves were not unreasonable. The next question is whether the manner in which the searches were conducted, *i.e.,* within the view of other inmates, was unreasonable.

In *Franklin v. Lockhart,* 883 F.2d 654 (8th Cir.1989), an inmate challenged the constitutionality of the manner and place in which visual body cavity strip searches were conducted—in the hallway where inmates in cells nearby could view the searches. Prison officials testified that the alternatives, conducting the searches in the showers or behind portable hospital screens, presented security risks. The court concluded that because these security concerns justified the searches and since the record did not support a less public means that would not have compromised security, the searches did not violate the Fourth Amendment. *Id.* at 657.

The court finds the reasoning of *Franklin* to be persuasive and in accordance with the Court's balancing test in *Wolfish.* 441 U.S. at 559, 99 S.Ct. at 1884. Under the circumstances of this case, defendant took additional steps to try to protect the privacy of inmates who were subjected to strip searches. Defendant did not install privacy curtains at the outset be-

cause he believed they would impede the officer's view of the inmate being searched and thereby allow inmates to hide contraband. These concerns were legitimate. That defendant later decided to provide inmates with the privacy curtains does not render his initial decision or the initial searches unreasonable. As defendant recognizes, it is preferable to conduct strip searches in a way that protects the privacy of the inmates as much as possible. The court cannot conclude however, that plaintiff's privacy interest in not having other inmates view the strip searches outweighed the security interests of the prison in this case.

Therefore, the court finds as a matter of law that even if other inmates observed plaintiff being strip searched, his constitutional rights were not violated. The factual dispute over whether other inmates could view the searches is therefore not outcome determinative. The court finds that there is no genuine issue as to any material fact and defendant is entitled to judgment as a matter of law on plaintiff's Fourth Amendment claim.

### B. *Fourteenth Amendment*

Plaintiff also contends that defendant intentionally violated his constitutionally protected liberty interest by allowing the strip searches to be conducted in a place that was not private as required pursuant to Wis.Admin.Code § DOC 306.16(1)(b). This regulation provides in pertinent part:

> A strip search may only be conducted in a clean and private place.

Defendant asserts that irrespective of whether the searches took place in a "private place" within the meaning of the regulation, plaintiff simply does not have a constitutionally protected liberty interest.

The Fourteenth Amendment reads in part: "nor shall any State deprive any person of life, liberty, or property, without due process of law," and protects "the individual against arbitrary action of government," *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). Fourteenth Amendment due process claims are examined in two steps. First, the plain-

tiff must demonstrate that a liberty or property interest exists and that the interest was interfered with by the state. *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). Second, the procedures attendant upon the deprivation are examined to determine their constitutional sufficiency. *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983). The Supreme Court has recognized that a protected liberty interest "may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt,* 459 U.S. at 466, 103 S.Ct. at 868.

■ In order to create a liberty interest, a state law or regulation must: 1) establish "substantive predicates" that operate to limit an official's discretion, *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871; and 2) establish that the regulation or law mandates a particular outcome upon a finding that the relevant criteria have been met. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 462, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989). An inquiry into whether a state-created liberty interest exists requires a close examination of the language of the applicable statute or regulation. *Id.* at 461, 109 S.Ct. at 1909. The Supreme Court has noted that most "procedural due process cases in the prison context have turned on the presence or absence of language creating 'substantive predicates' to guide discretion." *Id.* at 462, 109 S.Ct. at 1909. The court has also articulated a requirement that the regulations contain "explicitly mandatory language," *i.e.,* specific directives to the decision maker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest. *Id.* at 463, 109 S.Ct. at 1909. In sum, the use of "explicitly mandatory language," in connection with the establishment of "specific substantive predicates" to limit discretion, forces a conclusion that the State has created a liberty interest. *Id.; see also Smith v. Shettle,* 946 F.2d 1250, 1255–58 (7th Cir.1991) (Coffey, J., concurring).

Defendant contends that the "may only" language of the regulation, Wis. Adm.Code § DOC 306.16(1)(b), satisfies the explicitly mandatory language requirement. Although arguably mandatory, this language is simply not relevant to the determination of whether a prisoner may be deprived of his liberty interest by being subjected to a visual strip search. The language of § DOC 306.16(1)(b) merely defines the four types of searches of inmates and the manner in which each is to be conducted. The language is not used in connection with the establishment of "specific substantive predicates" to limit discretion.

Comparatively, another section of the regulations, specifically § DOC 306.16(3)(c), is relevant to the determination of whether a prisoner may be subjected to a visual strip search by establishing "substantive predicates" that operate to limit an official's discretion. This section provides in part:

> (3) A strip search *may* be conducted:
>> (c) Before and after a visit to an inmate;

(emphasis added). Although § DOC 306.16(3)(c) requires the decision maker to apply certain substantive predicates in determining whether to conduct a visual strip search, it does not contain any mandatory language, rather the language "may" connotes permissiveness or discretion. Defendant relies on § DOC 306.16(1)(b) which arguably contains mandatory language ("may only"). Significantly, however, this section lacks *relevant* mandatory language. Its mandatory language is not relevant because it does not expressly require the decision maker to apply certain substantive predicates in determining whether a prisoner may be deprived of the particular interest in question. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 464 n. 4, 109 S.Ct. 1904, 1910–11 n. 4, 104 L.Ed.2d 506 (1989).

In sum, neither regulation uses "explicitly mandatory language" in connection with the establishment of "specific substantive predicates" to limit discretion. Consequently, these regulations do not establish a liberty interest entitled to the protections of the Due Process Clause of the Fourteenth Amendment. Hence, even assuming that the searches conducted herein on plaintiff violated the provisions of § 306.16(1)(b), because they were not conducted in a private place, such violation would not give rise to a constitutionally protected liberty interest. Therefore, as a matter of law, defendant will be granted summary judgment on plaintiff's Fourteenth Amendment claim.

**IV.   Conclusion**

For the foregoing reasons, defendant's motion for summary judgment on plaintiff's Fourth and Fourteenth Amendment claims will be granted. Accordingly,

IT IS ORDERED that defendant's motion for summary judgment be and the same is hereby GRANTED; and,

IT IS FURTHER ORDERED that the above-captioned matter be and the same is hereby DISMISSED with prejudice and without costs.